Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: |
| v. | § | |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC; ALLIANCE TEXAS | § | |
| HOLDINGS, LLC; NEIL Z. AUERBACH; | § | |
| JUDITH AUERBACH; AUERBACH | § | |
| PARTNERS, L.P.; JAMES GOODMAN; | § | |
| JAMES FRINZI; GOODMAN | § | |
| INVESTMENT HOLDINGS, LLC; | § | |
| GENESIS NETWORKS, INC.; GENESIS | § | |
| NETWORKS GLOBAL SERVICES, LLC; | § | |
| AUERBACH CHILDREN'S DYNASTY | § | |
| TRUST U/A/D OCTOBER 9, 2012; and | § | |
| AUERBACH FAMILY DYNASTY TRUST | § | |
| U/A/D OCTOBER 9, 2012, | § | |
| Defendants. | | |

## ORIGINAL COMPLAINT

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel, Trustee (the "Trustee"), the trustee of Goodman Networks, Inc. (the "Debtor"), the debtor in the above styled and numbered chapter 7 bankruptcy case (the "Bankruptcy Case"), and files this *Original Complaint* (the "Complaint"), complaining of Hudson Clean Energy Enterprises, LLC ("Hudson"), Alliance Texas Holdings, LLC ("Alliance"), Neil Z. Auerbach ("Auerbach"), Judith Auerbach ("J. Auerbach"), Auerbach Partners, L.P. ("Auerbach Partners"), James Goodman ("Goodman"), James Frinzi ("Frinzi"), Goodman Investment Holdings, LLC ("GIH"), Genesis Networks, Inc. ("Genesis Inc."), Genesis Networks Global Services, LLC ("Genesis LLC"), Auerbach Children's Dynasty Trust u/a/d October 9, 2012 (the "Auerbach Trust 1"), and Auerbach Family Dynasty Trust u/a/d October 9, 2012 (the "Auerbach Trust 2"), and, for cause and action, would respectfully show as follows:

## I.    INTRODUCTION

1.      This Complaint concerns the transfer by the Debtor of $17 million designed to benefit and enrich Goodman and Auerbach at the expense of the Debtor and its creditors.  Namely, Goodman, through his entities, owned more than $30 million of the Debtor's bonds, which he knew could not and would not be repaid.  Knowing that the Debtor was insolvent and about to be in default on its bonds, Goodman sought a mechanism to cash out his bonds in secret.  Goodman entered into an agreement with Auerbach whereby Auerbach, through his entities, would purchase the bonds with the Debtor's funds—not his own funds—and would keep $5.9 million for himself with no benefit whatsoever to the Debtor.  Frinzi, the Debtor's CEO, executed the transaction for Goodman's personal benefit and to enrich Auerbach.  Auerbach knew of the Debtor's insolvency and of Goodman's and Frinzi's breaches of fiduciary duty, and conspired to help them breach that duty.  In the end, Goodman recovered $11 million he otherwise would not have, and Auerbach obtained almost $6 million to which he was not entitled and which provided no benefit to the

Debtor at all.  The Trustee therefore files this Complaint to avoid these transactions, obtain

monetary relief, and hold the conspirators accountable.

## II.    PROCEDURAL BACKGROUND

2.      On September 6, 2022 (the "Petition Date"), various petitioning creditors filed an

involuntary petition against the Debtor, thereby initiating the Bankruptcy Case and creating the

Debtor's bankruptcy estate (the "Estate").

3.      The Court entered an order for relief against the Debtor on December 12, 2022.

4.      The Trustee is the duly appointed trustee of the Debtor and the Estate.

5.      The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.  Such

jurisdiction is core under 28 U.S.C. § 157(b)(2).  To the extent that any matter in this Adversary

Proceeding is not core, the Trustee consents to this Court's entry of a final judgment over any and

all such matters.

6.      Venue of this Adversary Proceeding before this Court is proper under 28 U.S.C. §§

1408 and 1409.

## II.    PARTIES

7.      The Trustee is the Chapter 7 trustee of the Debtor and the Estate and files this

Complaint in such capacity only.

8.      Hudson is a limited liability company organized and existing under the laws of the

State of Delaware.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Hudson may be

served with process in this Adversary Proceeding by and through its registered agent, Cogency

Global Inc., as follows: Hudson Clean Energy Enterprises, LLC, c/o Cogency Global Inc.,

Registered Agent, 850 New Burton Road, Suite 201, Dover, DE 19904.

9.      Alliance is a limited liability company organized and existing under the laws of the

State of Florida.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Alliance may be

served with process in this Adversary Proceeding by and through its registered agent, Steven Zakharyayev, as follows: Alliance Texas Holdings, LLC, c/o Steven Zakharyayev, Registered Agent, 2719 Hollywood Blvd., Hollywood, FL 33020, and by and though its manager, Steven Zakharyayev, as follows: Alliance Texas Holdings, LLC, c/o Steven Zakharyayev, Manager, 8 South Main Street, P.O. Box 342, Marlboro, NJ, 07746.

10.     Auerbach is an individual and a resident of either the State of New York or of Florida.  He is sued herein both in his personal capacity and as a trustee of the Auerbach Trust. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach may be served with process in this Adversary Proceeding anywhere he may be found, including his home at: Neil Z. Auerbach, 50 Lawrence Ave., Lawrence, NY 11559, or where he regularly transacts business: Neil Z. Auerbach, CEO, Hudson Clean Energy Partners, 333 SE 2d Ave. #3410, Miami, FL 33131.

11.     Auerbach Partners is a limited partnership organized and existing under the laws of the State of Delaware.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach Partners may be served with process in this Adversary Proceeding by and through one or both of its general partners as follows: (i) Auerbach Partners, L.P., c/o Auerbach Children's Dynasty Trust u/a/d October 9, 2012, General Partner, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559; and/or (ii) Auerbach Partners, L.P., c/o Auerbach Family Dynasty Trust u/a/d October 9, 2012, General Partner, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559.

12.     Auerbach Trust 1 is a general partner of Auerbach Partners.  Auerbach Trust 1's trustees are Neil Z. Auerbach and Judith Auerbach.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach Trust 1 may be served with process in this Adversary Proceeding through its trustees as follows: Auerbach Children's Dynasty Trust u/a/d October 9, 2012, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559.

13.     Auerbach Trust 2 is a general partner of Auerbach Partners.  Auerbach Trust 2's trustees are Neil Z. Auerbach and Judith Auerbach.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Auerbach Trust 2 may be served with process in this Adversary Proceeding through its trustees as follows: Auerbach Family Dynasty Trust u/a/d October 9, 2012, c/o Neil A. Auerbach and Judith Auerbach, Trustees, 50 Lawrence Ave., Lawrence, NY 11559.

14.     J. Auerbach is a trustee of the Auerbach Trust and she is sued herein in said capacity only.[1]  J. Auerbach is an individual and a resident of either the State of New York or of Florida. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), J. Auerbach may be served with process in this Adversary Proceeding anywhere she may be found, including her home at: Judith Auerbach, 50 Lawrence Ave., Lawrence, NY 11559.

15.     Goodman is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Goodman may be served with process in this Adversary Proceeding anywhere he may be found, including his home at: James Goodman, 103 Tomahawk Trail, San Antonio, TX 78232, or where he regularly transacts business: James E. Goodman, Genesis Networks, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

16.     Frinzi is an individual and a resident of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Frinzi may be served with process in this Adversary Proceeding anywhere he may be found, including his home, as follows: James Frinzi, 9204 Eddy Cv., Austin, TX 78735.

17.     GIH is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), GIH may be served

---

[1]     As the Trustee does not know what type of trust this trust is, or what jurisdiction it is organized under, he does not know whether he is required to sue the trustee in order to sue the trust, or whether he may sue the trust directly.  The trustee is prepared to dismiss J. Auerbach from this Complaint, without prejudice, provided that Auerbach Trust 1 and Auerbach Trust 2 agree that the Trustee does not need to sue her in order to sue and to obtain a judgment against these trusts.

with process in this Adversary Proceeding by and through its registered agent, Blakely L. Fernandez, as follows: Goodman Investment Holdings, LLC, c/o Blakely L. Fernandez, Registered Agent, 300 Convent Street, Suite 2, San Antonio, TX 78205.

18.     Genesis Inc. appears to no longer be an entity, having been a Texas corporation merged into Genesis LLC.  However, because the documents described below reference Genesis Inc., it may be that Genesis Inc. is a d/b/a of Genesis LLC or is a fictional entity used by James Goodman.  Either way, Genesis Inc. may, pursuant to Federal Rule of Bankruptcy Procedure 7004(b), be served with process in this Adversary Proceeding by and through James Goodman, its manager, director, officer, or control person, at 103 Tomahawk Trail, San Antonio, TX 78232, or where he regularly transacts business: James E. Goodman, Genesis Networks, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

19.     Genesis LLC is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Genesis LLC may be served with process in this Adversary Proceeding by and through its registered agent, Wilburn R. Deahl, as follows: Genesis Networks Global Services, LLC, c/o Wilburn R. Deahl, Registered Agent, 309 Hilton Drive, Cibolo, TX 78108.

20.     As used hereinafter, "Genesis" refers to either or both Genesis Inc. and Genesis LLC, pending a determination of whether Genesis Inc. exists, whether it is a d/b/a of Genesis LLC, whether it is anything else, or which of the Genesis entities is the actual entity involved in the transactions and transfers discussed below.

### III.    FACTS

#### A.    THE PLAYERS

21.     As of January 31, 2022, Goodman was the sole director of the Debtor, owing fiduciary duties to the Debtor.  Goodman purported to resign as the director of the Debtor on

February 1, 2022 (which the Trustee does not admit).  However, he formed the strategy and entered

into the conspiracy that is the subject of this Complaint while he was a director of the Debtor.

22.     Alternatively, his resignation was a sham, done on paper to make it seem like he

was no longer a director at the time of the transactions described herein.  Even after such sham

resignation, he continued to control Frinzi and to give him instructions, which Frinzi implemented

as though Goodman were still a director.

23.     Alternatively, due to his special relationship with the Debtor, including managing

the majority shareholder of the Debtor and making decisions for the Debtor as such, and his *de*

*facto* control of Frinzi, and his knowledge of confidential books and records and financial

transactions of the Debtor, and the trust that Frinzi and others at the Debtor placed in him, and his

ability to orchestrate the transactions complained of herein and other transactions, Goodman is

charged by law with fiduciary duties to the Debtor as though he were a *de jure* director of the

Debtor.

24.     At all times material to this Complaint, Goodman was an insider of the Debtor: as

a director, as the person who controlled the majority of the Debtor's stock, and as the person who

controlled Frinzi even after the time that he may have resigned as a director, and whose instructions

Frinzi followed regardless of whether Goodman was a director or not.

25.     At all times material to this Complaint, Goodman directly or indirectly owned GIH

and controlled GIH.

26.     At all times material to this Complaint, GIH was an insider of the Debtor as an

affiliate and through the common control of both GIH and the Debtor by Goodman.

27.     At all times material to this Complaint, Goodman directly or indirectly owned

Genesis and controlled Genesis.

28.     At all times material to this Complaint, Genesis was an insider of the Debtor as an affiliate and through the common control of both Genesis and the Debtor by Goodman.

29.     At all times material to this Complaint, Frinzi was the Chief Executive Officer of the Debtor, owing fiduciary duties to the Debtor.

30.     Auerbach is a wealthy and successful investor and funds manager in New York.

31.     Hudson is an entity directly or indirectly owned by Auerbach and controlled by Auerbach.

32.     Alliance is an entity which Auerbach controls and, upon information and belief, directly or indirectly owns.   The registered agent for Alliance is Steven Zakharyayev ("Zakharyayev").

33.     Auerbach, Goodman, and Frinzi, directly and through their respective families, have been friends for a long period of time and, upon information and belief, have engaged in business together.   Furthermore, upon information and belief, Zakharyayev is friends with Auerbach's son, Shalom Auerbach ("Shalom"), and has done business with him.   Thus, all of the individuals involved in this matter have personal, familial, and/or business relationships predating the Debtor.

**B.     THE PLAN**

34.     As of February 1, 2022, and at all times material hereto, the Debtor was insolvent.

35.     Among other things, the Debtor lost its largest customer in October 2021, had stopped paying Federal Express Logistics (a major creditor) tens of millions of dollars and knew that FedEx would soon begin to exercise its remedies, had stopped paying other large creditors and vendors, and knew that it would soon be unable to make payment on the Bonds (defined below).   In short, the Debtor would soon cease all business operations, even as most of its business operations had already ceased due to the loss of its customers.   Goodman and Frinzi knew all of

this.  Upon information and belief, Auerbach too was made aware of this, either through Goodman and/or Frinzi, or through his son, Shalom.

36.     Commencing in late 2021, and through early 2022, however, the Debtor had amassed tens of millions of dollars in cash on hand, mainly because it stopped paying its largest creditors, including FedEx.  The question for Goodman was how to exploit this cash for his or his other companies' and friends' benefit, before creditors would exercise their remedies and the cash would be seized.

37.     As of February 1, 2022, the Debtor had issued and had outstanding certain 8.00% Senior Secured Notes due 2022 (the "Bonds"), with respect to which UMB National Bank (the "Indenture Trustee") served as the indenture trustee.

38.     The maturity of the Bonds was May 11, 2022.  The Debtor, Goodman, and Frinzi knew that the Debtor would not be able to repay the Bonds on that date and that the Bonds would be in default as of that date.

39.     Prior to and at that time, Goodman was attempting to have the Debtor cancel as much of the Bonds as it could for less than face value, in order to relieve the Debtor of its debt burden at a discount.  As part of this, Goodman, directly or indirectly, purchased or otherwise acquired a certain amount of the Bonds at a discount.  Employees of the Debtor and various creditors knew that Goodman had, and was attempting to, purchase Bonds at a discount, partially to aid the Debtor's financial issues.

40.     As of February 3, 2022, GIH held and owned $30,146,617.00 of the Bonds (the "GIH Bonds").

41.     As of February 3, 2022, Genesis held and owned $1,600,000 of the Bonds (the "Genesis Bonds").

42.    Thus, by February 1, 2022, Goodman knew that the Debtor was insolvent, would not be able to repay the Bonds and would shortly default on the Bonds.  Goodman therefore knew that his ability to recover on the GIH Bonds and the Genesis Bonds would soon expire, and that a bankruptcy proceeding was instead highly likely, especially because the Debtor had been through a Chapter 11 proceeding before, existing only a few years earlier.  Goodman did not want the Debtor to simply pay on the Bonds, because he would then have to share in the proceeds of such payment with other holders of the Bonds.

43.    Furthermore, on or about June 4, 2021, Unified Field Services, Inc. ("UFS"), a company owned and controlled by Goodman, entered into an *Asset Purchase Agreement* with the Debtor, pursuant to which it purchased certain assets from the Debtor.  As part of said agreement, GIH, UFS, and Goodman agreed to waive any interest payable on the Bonds through 2024, and to extend the maturity under the Bonds from May 11, 2022 to May 11, 2024.  Thus, Goodman knew that he could not direct payments by the Debtor on the GIH Bonds and the Genesis Bonds and that he, GIH, and UFS would face potential liability for breach of contract if he did so.

44.    In January, 2022, Goodman and Frinzi were considering how to use the tens of millions of dollars of cash that the Debtor had left (after approximately $50 million that Frinzi had separately transferred to himself and his other entities).  Instead of weighing options on using those funds to pay creditors, the topic of discussion was how Goodman could monetize the GIH Bonds and Genesis Bonds before he would lose the ability to do so.  Frinzi encouraged Goodman to make some money on these Bonds, and advised that a third party be used for the transaction.

45.    Upon information and belief, the intent in using a third party was to hide the true nature of the transaction from the Debtor's creditors, make it more difficult to claw-back any payments through the use of intermediaries and conduits, and for Goodman to avoid potential breach of contract claims related to the UFS agreement.  Thus, in response, Goodman proposed

that he sell these Bonds to Shalom for 35 cents on the dollar.  Frinzi agreed and encouraged Goodman to proceed.

46.     Thereafter, upon information and belief, Goodman and Auerbach (directly or through agents) entered into an agreement whereby each would enrich himself at the expense of the Debtor: the Debtor would fund a purchase of the GIH Bonds and Genesis Bonds for 35 cents on the dollar, and Auerbach would make a large premium for acting as some kind of intermediary to conceal the transaction and to participate as a Straw Man, to hide the fact of actual payment or repayment of the Bonds to Goodman and his entities.  In other words, rather than Auerbach buying the Bonds with his funds, or rather than the Debtor redeeming or paying the Bonds directly, Goodman, Frinzi, and Auerbach agreed to hide the true nature of the persons involved and the payments and transactions involved.

47.     Auerbach is a successful businessman and director, officer, and manager of billions of dollars in funds and investments.  He knows of fiduciary duties and business ethics.  As such, Auerbach knew or should have known that his role in the proposed transaction was to facilitate something nefarious and to conceal and hide the true nature of the transactions.  As such, Auerbach knew or should have known that he would not be offered millions of dollars in profit, without putting in any money or assuming any risk, except as a payment to participate in the fraudulent and concealed nature of the transaction.  And, as Auerbach knew or should have known that the Debtor was insolvent, and was not using his own funds to purchase the Bonds, he knew or should have known that Goodman and Frinzi were breaching their fiduciary duties by orchestrating the transaction; hence the reason he was offered a multi-million dollar immediate profit for putting in no money and assuming no risk.

48.     Simply put, in a transaction such as this, a reasonably prudent person, especially one with the sophistication of Auerbach, knows or should know that he is being paid millions of

dollars for a purpose, and that that purpose is not legitimate but is instead to effectuate and conceal a tort.  That Auerbach knew of the torts and willingly participated in them, and the concealment, is further evidenced by the two "fund flow memorandums" and the concealment of the true nature of the flow of funds below.

## C.    IMPLEMENTATION OF THE PLAN

49.    On or about February 3, 2022, GIH and Genesis, as sellers, and Alliance, as the buyer, entered into that certain *Bond Purchase Agreement* (the "Purchase Agreement").

50.    Pursuant to the Purchase Agreement, GIH would sell the GIH Bonds to Alliance for a payment of $10,570,912.00 (the "GIH Purchase Price").  This is 35% of face value.

51.    Pursuant to the Purchase Agreement, Genesis would sell the Genesis Bonds to Alliance for a payment of $561,041.00 (the "Genesis Purchase Price").  This is 35% of face value.

52.    However, Alliance did not have the money to pay for the foregoing purchases. Rather, the plan, as envisioned by Goodman and Auerbach, was to have the Debtor fund both the GIH Purchase Price and the Genesis Purchase Price.

53.    As part of the plan by Goodman and Auerbach to hide the identity of the parties and the nature of the transactions, Auerbach decided to use Hudson as an alleged intermediary; Hudson otherwise being a respected business entity.

54.    Thus, on February 3, 2022, Alliance, as principal, and Hudson, as agent, entered into that certain *Agency Agreement* (the "Agency Agreement").

55.    Pursuant to the Agency Agreement, Hudson agreed to act as the agent for Alliance to effectuate the Purchase Agreement, in consideration of $1,000.00.

56.    Upon information and belief, the purpose of the Agency Agreement was to hide the fact that it would be the Debtor which would pay the GIH Purchase Price, the Genesis Purchase Price, and more.

57.    On February 3, 2022, the Debtor caused to be transferred $17,032,060.00 to Hudson, from the Debtor's bank account at Prosperity Bank ending in 4352 (the "Main Transfer"). The Debtor had an interest in the funds used to make the Main Transfer.

58.    The sum of $17,032,060.00 is more than the GIH Purchase Price and the Genesis Purchase Price.  Upon information and belief, the difference of $5,900,107.00 (the "$5.9 Million Transfer") was intended to benefit and enrich Auerbach for acting as the intermediary to hide the true nature of the transaction.

59.    What follows are two different versions of the flow of funds, believed to be done intentionally to hide the fact of the $5.9 Million Transfer and to deceive the lawyers involved, as well as the Debtor's employees.  And, although unclear, there appear to be two "execution" versions of the Purchase Agreement.  Alternatively, the two sets of documents were designed to be "back-to-back" agreements, intended to close simultaneously, where Hudson, Auerbach, and Auerbach Partners would make a large profit for acting as a middle-man, with no funds or risk of their own at all in the transaction.

60.    The signed Purchase Agreement references a purchase price of $10,570,912.00, to be transferred "as set forth in the attached Funds Flow Memorandum."  Namely, on February 3, 2022, GIH, Genesis, and Alliance entered into that certain *Funds Flow Memorandum*, referenced in the Purchase Agreement, pursuant to which $10,570,912.00 of the Main Transfer would be transferred from Hudson to GIH, and pursuant to which $561,041.00 of the Main Transfer would be transferred from Hudson to Genesis, and which otherwise does not account for the balance of the Main Transfer ($5,900,107.00).  The same also references that the subject Bonds would be transferred from Pershing Square Capital to Hudson, as agent.  Thus, anyone reviewing the Purchase Agreement would therefore not know that an additional $5.9 million was involved, and

it would seem like the Debtor was using its funds to effectively retire more than $30 million in Bonds—a seemingly positive and beneficial arrangement.

61.     Both of the above, the signed Purchase Agreement and the signed funds flow memorandum, appear to have been executed the morning of February 3, 2022.  Both are signed by Auerbach on behalf of Alliance.  These were the versions of the documents shared with the respective lawyers involved papering the transaction.

62.     However, there is a different version of the Purchase Agreement, also styled as "Execution Version," but which has not been signed, at least not in the form produced to the Trustee.  In this version, which is a red-line from the afternoon of February 3, 2022, the purchase price—which is not redlined or track-changed, as though it has always remained the same—is $17,032,060.00.  This matches to the penny the amount of the Main Transfer.  Additionally, this version states that the transfers will be made "as directed by Purchaser."  Under this document, the "Purchaser" is defined as the Debtor, and the "Seller" is defined as Alliance.

63.     There is also a different version, unsigned, of the funds flow memorandum to go with this document, under which: (i) Hudson pays $10,570,912.00 of the Main Transfer to GIH; (ii) Hudson pays $561,041.00 of the Main Transfer to Genesis; and (iii) Hudson pays $5,900,107.00 of the Main Transfer to "Auerbach Partners LP."  This is the first mention of an Auerbach Partners.

64.     The communications involving this second funds flow memorandum exclude the attorneys involved and include only Max Klein, an employee of Hudson, John Mcmullan, also an employee of Hudson, Shalom, and Auerbach.  Max Klein writes that this flow of funds is what Shalom approved, and Auerbach also writes "approved."  Max Klein also writes to Auerbach that "Auerbach Partners should also have received the fees."  Thus, it is known that this, unsigned and

concealed funds flow memorandum, shows the true flow of funds and demonstrates the true intent of the persons involved.

65.     The Trustee is unaware of any alleged fees, other than the $1,000 agency fee to Hudson, and is certainly not aware of any fees payable to Auerbach Partners.

66.     Auerbach and Auerbach Partners are the intended beneficiaries of the $5.9 Million Transfer.  Auerbach Trust 1 and Auerbach Trust 2 are the general partners of Auerbach Partners and, as such, are jointly and severally liable with Auerbach Partners.

67.     It therefore appears that Auerbach charged a premium or a fee in the amount of the $5.9 Million Transfer for buying the GIH Bonds and Genesis Bonds from Goodman and then selling (if that is even what happened) the same GIH Bonds and Genesis Bonds to the Debtor, on the same day.  The problem is that Auerbach and Auerbach Partners did not use their own money to do this which, if they had, the premium or fee may have been unconscionable (and a constructively fraudulent transfer), but it may have represented a shrewd investor's profit.  Instead, for no money of their own and for no risk of their own, they had the Debtor fund the purchase and then make an immediate $5.9 million profit.  And, in no event did Auerbach Partners play any legitimate role in this to receive the $5.9 Million Transfer, as it would have been Alliance, as the purchaser of the GIH Bonds and Genesis Bonds, that would have sought to make some profit, illegitimate as it may have been.

68.     Frinzi authorized the wire representing the Main Transfer.  Frinzi knew the purchase price for the GIH Bonds and Genesis Bonds to be 35%.  Simple math would have shown him that the Debtor was overpaying that amount by $5.9 million, or he voluntarily caused the Debtor to pay that extra amount as a "fee" to benefit his friends, knowing of the purpose of the $5.9 Million Transfer.

69.     The Trustee has conferred with the Indenture Trustee and understands that the GIH Bonds have been cancelled.

70.     The Trustee has conferred with the Indenture Trustee and understands that the Genesis Bonds have not been cancelled and remain outstanding.

## IV.   CAUSES OF ACTION

**COUNT 1 :**   **BANKRUPTCY CODE $5.9 MILLION FRAUDULENT TRANSFER (HUDSON, AUERBACH, AUERBACH PARTNERS)**

71.     The Trustee incorporates his allegations above.

72.     The Debtor was insolvent when it made the Main Transfer and/or the $5.9 Million Transfer.

73.     One or more of Hudson, Auerbach, and Auerbach Partners are the initial transferees of the $5.9 Million Transfer or the persons for whose benefit the transfer was made.

74.     To the extent that Auerbach or Auerbach Partners was a subsequent transferee of the $5.9 Million, they took the same in bad faith knowing of the avoidance and fraudulent nature of the $5.9 Million Transfer.

75.     Even if the Debtor received some value for the cancellation of the GIH Bonds resulting from the Main Transfer, the Debtor received no value whatsoever for the $5.9 Million Transfer.  The price for the GIH Bonds and Genesis Bonds was known and was set at 35%, and Hudson was entitled to a payment of only $1,000 for acting as agent.  Accordingly, the $5.9 Million Transfer was a constructively fraudulent transfer.

76.     Additionally, the $5.9 Million Transfer was an actually fraudulent transfer intended to delay, hinder, and defraud the Debtor's creditors while enriching Hudson, Auerbach, and/or Auerbach Partners, and made by the Debtor through Goodman with the foregoing intent.

77.     Among other things: (i) the Debtor was insolvent; (ii) the Debtor had been threatened with suit and knew that it would soon default on the Bonds; (iii) the transfer was concealed, including from the attorneys involved through the use of two flow of funds memorandums; (iv) the fact of a fraudulent flow of funds memorandum demonstrates actual fraud; (v) and the transfer was necessary for Goodman, an insider, to obtain his own transfers, which he could not otherwise have obtained.

78.     To the extent that the $5.9 Million Transfer was some sort of "fee," it is unconscionable and something that the Debtor received no reasonably equivalent benefit for, as it was Goodman, GIH, and/or Genesis that receiver any resulting benefit by obtaining a recovery on the GIH Bonds and Genesis Bonds.

79.     Accordingly, pursuant to sections 548(a)(1)(A) and 548(a)(1)(B), the Trustee seeks the avoidance of the $5.9 Million Transfer.

**COUNT 2:   TUFTA[2] $5.9 MILLION FRAUDULENT TRANSFER (HUDSON, AUERBACH, AUERBACH PARTNERS)**

80.     The Trustee incorporates his allegations above.

81.     Pursuant to section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a prepetition transfer by the Debtor that an unsecured creditor could avoid.

82.     As of February 1, 2022, the Debtor had multiple unsecured creditors who remain unpaid.

83.     The Debtor was insolvent when it made the Main Transfer and/or the $5.9 Million Transfer.

84.     One or more of Hudson, Auerbach, and Auerbach Partners are the initial transferees of the $5.9 Million Transfer or the persons for whose benefit the transfer was made.

---

[2] The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§ 24.001 *et. seq.*

85.    To the extent that Auerbach or Auerbach Partners was a subsequent transferee of the $5.9 Million, they took the same in bad faith knowing of the avoidance and fraudulent nature of the $5.9 Million Transfer.

86.    Under sections 24.005(2) and 24.006(a) of TUFTA, the Trustee may avoid a constructively fraudulent transfer.

87.    Even if the Debtor received some value for the cancellation of the GIH Bonds resulting from the Main Transfer, the Debtor received no value whatsoever for the $5.9 Million Transfer.  The price for the GIH Bonds and Genesis Bonds was known and was set at 35%, and Hudson was entitled to a payment of only $1,000 for acting as agent.  Accordingly, the $5.9 Million Transfer was a constructively fraudulent transfer.

88.    Under section 24.005(1), the Trustee may avoid an actually fraudulent transfer.

89.    The $5.9 Million Transfer was an actually fraudulent transfer intended to delay, hinder, and defraud the Debtor's creditors while enriching Hudson, Auerbach, and/or Auerbach Partners, and made by the Debtor through Goodman with the foregoing intent.

90.    Among other things: (i) the Debtor was insolvent; (ii) the Debtor had been threatened with suit and knew that it would soon default on the Bonds; (iii) the transfer was concealed, including from the Debtor's counsel and potentially Frinzi through the use of two flow of funds memorandums; (iv) the fact of a fraudulent flow of funds memorandum demonstrates actual fraud; (v) and the transfer was necessary for Goodman, an insider, to obtain his own transfers, which he could not have otherwise obtained.

91.    To the extent that the $5.9 Million Transfer was some sort of "fee," it is unconscionable and something that the Debtor received no reasonably equivalent benefit for, as it was Goodman, GIH, and/or Genesis that receiver any resulting benefit by obtaining a recovery on the GIH Bonds and Genesis Bonds.

92.    Accordingly, pursuant to sections 24.005 and 24.006 of TUFTA, and section 548 of the Bankruptcy Code, the Trustee seeks the avoidance of the $5.9 Million Transfer.

93.    The Trustee further seeks his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 3:**     **TUFTA FRAUDULENT TRANSFER/INSIDER PREFERENCE (GIH AND GENESIS)**[3]

94.    The Trustee incorporates his allegations above.

95.    Pursuant to section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a prepetition transfer by the Debtor that an unsecured creditor could avoid.

96.    As of February 1, 2022, the Debtor had multiple unsecured creditors who remain unpaid.

97.    The Debtor was insolvent as of February 1, 2022 and at all times thereafter,

98.    At the time that GIH and Genesis received the GIH Purchase Price and the Genesis Purchase Price, each of GIH and Genesis were insiders of the Debtor.  Each was the initial transferee of such transfers or the entity for whose benefit such transfers were made.

99.    The purpose and intent of the GIH Purchase Price and Genesis Purchase Price transfers was to repay GIH and Genesis for the GIH Bonds and the Genesis Bonds, even if the transaction was structured as a sale to Alliance, which sale was a sham, since the Debtor used its funds to make the payments as opposed to Alliance investing any of its own funds or risk.  In truth and in substance, the transaction was designed and intended to pay HIG and Genesis on the Bonds that they held, since Goodman knew that the Debtor would not otherwise be able to pay the same.

100.    Under TUFTA, an unsecured creditor, and therefore now the Trustee, may avoid a transfer to a creditor who was an insider for an antecedent debt.  The HIG Purchase Price and the

---

[3] The Trustee and Estate hold other claims and causes of action against GIH and Genesis, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

Genesis Purchase Price represented such transfers.  Moreover, through the common control of the

Debtor, HIG, and Genesis by Goodman, HIG and Genesis knew that the Debtor was insolvent at

the time that it made the transfers.

101.    Accordingly, pursuant to section 544 of the Bankruptcy Code and section 24.006(b)

of TUFTA, the Trustee seeks the avoidance of the HIH Purchase Price and the Genesis Purchase

Price transfers.

102.    The Trustee further seeks his reasonable costs and attorney's fees in avoiding and

recovering the same under section 24.013 of TUFTA.

**COUNT 4:**    **MAIN TRANSFER AS FRAUDULENT TRANSFER**

103.    The Trustee incorporates his allegations above.

104.    In the alternative, if the intention behind the Main Transfer was not for the Debtor

to be relieved of certain Bonds at discounted prices, then the Main Transfer itself is both a

constructively fraudulent transfer and an actually fraudulent transfer.

105.    As such, Hudson, Alliance, Auerbach, and Auerbach Partners are the initial

transferees of the Main Transfer, as are GIH, Genesis, Auerbach, and Auerbach Partners, as the

parties for whose benefit the Main Transfer was made.  To the extent any is a subsequent

transferee, it did not take the transfer in good faith and without knowledge of its avoidance.

106.    The Debtor was insolvent when it made the Main Transfer.

107.    The Main Transfer is a constructively fraudulent transfer because the Debtor

received less than reasonably equivalent value for the retirement of one or both of the GIH Bonds

and Genesis Bonds, as the same were worth far less than the amounts paid (even excluding the

$5.9 Million Transfer), since the Debtor was insolvent, had no ability to repay the bonds near their

face amounts or the amounts they traded at, and was about to default on the bonds.

108.     Additionally, the Debtor, through Goodman, made the Main Transfer with the intention of hindering, delaying, and defrauding its creditors, specifically by removing funds that could be used to pay creditors in order that insiders and their friends could benefit.  Among other things: (i) the Debtor was insolvent; (ii) the Debtor had been threatened with suit and knew that it would soon default on the Bonds; (iii) the transfer was concealed, including from the Debtor's counsel and potentially Frinzi through the use of two flow of funds memorandums; (iv) the fact of a fraudulent flow of funds memorandum demonstrates actual fraud; (v) and the purpose of the transfer was to cause the Debtor to dispose of liquid funds before the same could be seized or attached by one or more of the Debtor's creditors.

109.     The mere fact that an intermediary was used in the form of Hudson evidences the intention to conceal and hide the transaction, as does the additional concealment of Auerbach and Auerbach Partners as being the actual persons behind the transaction who received much of the Main Transer.

110.     Accordingly, pursuant to sections 24.005 and 24.006 of TUFTA, and section 548 of the Bankruptcy Code, the Trustee seeks the avoidance of the Main Transfer as a constructively fraudulent transfer and an actually fraudulent transfer.

111.     The Trustee further seeks his reasonable costs and attorney's fees in avoiding and recovering the same under section 24.013 of TUFTA.

**COUNT 5:**     **FRAUDULENT TRANSFER—GENESIS BONDS (ALLIANCE)**

112.     The Trustee incorporates his allegations above.

113.     Upon information and belief, Alliance has not cancelled the Genesis Bonds sold to it, whether that was the intent or not.

114.     The funds used to enable Alliance to acquire the Genesis Bonds came from the Debtor, for which the Debtor received no reasonably equivalent value.

115.    Accordingly, pursuant to section 548 of the Bankruptcy Code, the Trustee seeks the avoidance, as a constructively fraudulent transfer, of the transfer of the Genesis Purchase Price, and a recovery, under section 550 of the Bankruptcy Code, of the Genesis Bonds for the Estate.

**COUNT 6:    RECOVERY OF AVOIDED TRANSFERS**

116.    The Trustee incorporates his allegations above.

117.    Pursuant to section 550 of the Bankruptcy Code, upon the avoidance of each transfer requested above, the Trustee seeks a recovery of such transfer by way of money judgment against each transferee or subsequent transferee named herein, except with respect to the Genesis Bonds which, if still held by Alliance, the Trustee seeks the turnover of to the Estate.

**COUNT 7:    BREACH OF FIDUCIARY DUTY (GOODMAN)[4]**

118.    The Trustee incorporates his allegations above.

119.    Goodman, while still a director of the Debtor, planned the strategy that led to the transfers described above to GIH, Genesis, and Auerbach/Hudson.  That he nominally resigned days prior to the date of such transfers is not determinative, because Frinzi, as the Debtor's CEO, merely implemented the strategy that his director had ordered him to.

120.    Alternatively, or additionally, Goodman's purported resignation as director on February 1, 2022 was a sham.  Upon information and belief, Goodman remained in control of the Debtor and of Frinzi, continuing to instruct Frinzi with respect to multiple subsequent transactions.  Thus, upon information and belief, Goodman remained as a director at all times material hereto.

121.    As a director of the Debtor, Goodman owed a duty of, among other things, loyalty and of care to the Debtor.

---

[4] The Trustee and Estate hold other claims and causes of action against Goodman, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

122.    Goodman breached the duty of loyalty by self-dealing and looking to his personal interests ahead of the interests of the Debtor, in having the Debtor pay the GIH Purchase Price and the Genesis Purchase Price, both of which benefited him and his other companies, at the expense of the Debtor, its ongoing business, and its ability to service its debt and pay its creditors.

123.    Goodman breached the duty of loyalty by orchestrating the $5.9 Million Transfer, which enriched his friend, Auerbach, at the expense of the Debtor, and for which the Debtor received no value.

124.    Goodman breached the duty of care by orchestrating the $5.9 Million Transfer, because he knew that the price for the GIH Bonds and Genesis Bonds was 35%, yet he had the Debtor pay $5.9 million more than this purchase price for no return consideration to the Debtor, in what amounts to gross negligence.

125.    Accordingly, the Trustee seeks a money judgment against Goodman for the foregoing breaches of fiduciary duty.

**COUNT 8:**    **BREACH OF FIDUCIARY DUTY (FRINZI)**[5]

126.    The Trustee incorporates his allegations above.

127.    At all times material hereto, Frinzi was the Chief Executive Officer of the Debtor. As such, he owed fiduciary duties to the Debtor, including the duty of loyalty and the duty of care.

128.    Frinzi participated in and approved of the Main Transfer, and personally authorized and instructed the Main Transfer.  To the extent that the same was instructed by Goodman, Frinzi nevertheless had an independent fiduciary duty to the Debtor with respect to the same.

129.    In participating in, orchestrating, and instructing the foregoing, Frinzi breached his duty of loyalty to the Debtor.  Namely, in order to enrich Goodman and provide a preferential

---

[5] The Trustee and Estate hold other claims and causes of action against Frinzi, including for breaches of fiduciary duty, not directly related to the facts of this Complaint, and the Trustee reserves and preserves all such other claims and causes of action.  Nothing herein shall prejudice the same.

return to Goodman on the GIH Bonds and Genesis Bonds, which Frinzi knew would otherwise not be paid, and in order to please his boss in order to retain his own job and benefits, Frinzi placed the interests of Goodman ahead of those of the Debtor, thereby benefiting Goodman at the expense of the Debtor, which lost the funds it needed to continue operations and pay debts.

130.     In participating in, orchestrating, and instructing the foregoing, Frinzi also breached his duty of care to the Debtor.  To the extent that Frinzi believed the Debtor would be benefited from the cancellation of the GIH Bonds and Genesis Bonds, Frinzi also knew that the price for the same was 35%, or precisely the amount of the GIH Purchase Price and the Genesis Purchase Price. Yet Frinzi caused the Debtor to pay $5.9 million more, in what is either gross negligence because a $2 calculator could have told him what the correct price was or, if done intentionally, a breach of the duty of loyalty, by causing the Debtor to enrich another—Frinzi's friend Auerbach—for no return consideration to the Debtor.

131.     Accordingly, the Trustee seeks a money judgment against Frinzi for the foregoing breaches of fiduciary duty.

**COUNT 9:**     **CONSPIRACY (AUERBACH AND AUERBACH PARTNERS)**

132.     The Trustee incorporates his allegations above.

133.     A civil conspiracy consists of a combination of two or more persons, seeking to accomplish a shared object or course of action, a meeting of the minds on such object or course of action, one or more unlawful, over acts in pursuance thereof, and resulting damages.

134.     At all times material hereto, Auerbach and Auerbach Partners, through Auerbach, knew that the Debtor was insolvent and would not be able to repay the Bonds or its other debts. Auerbach knew that Goodman sought to exploit this situation for his personal benefit, by getting paid on the GIH Bonds and Genesis Bonds before the Debtor lost any ability to repay the same. Auerbach used this situation to also enrich himself at the expense of the Debtor.  Auerbach and

Goodman had a meeting of the minds that both would exploit this situation for their personal benefits, with each agreeing to the enrichment of the other, at the expense of the Debtor. Auerbach, a successful and sophisticated businessman and funds manager, knew that Goodman and Frinzi owed fiduciary duties to the Debtor, which they would breach by entering into the transactions described above, particularly with respect to the $5.9 Million Transfer. Both Goodman and Frinzi breached their fiduciary duties in agreeing to, orchestrating, and effectuating the Main Transfer and, in particular, the $5.9 Million Transfer. The Debtor was damaged as a result.

135.    Accordingly, the Trustee seeks a money judgment against Auerbach, jointly and severally with Goodman and Frinzi, for the damages caused to the Debtor by Goodman's and Frinzi's breaches of fiduciary duty as otherwise described above, in an amount to be proven at trial.

## COUNT 10:   UNJUST ENRICHMENT (HUDSON, AUERBACH, AUERBACH PARTNERS)

136.    The Trustee incorporates his allegations above.

137.    Hudson, Auerbach, and/or Auerbach Partners, to extent the recipients of the $5.9 Million Transfer, were unjustly enriched by the Debtor insofar as they obtained large sums from the Debtor without providing any value to the Debtor.

138.    Accordingly, the Trustee seeks a money judgment against Hudson, Auerbach, and Auerbach Partners, jointly and severally, for $5.9 million, or against each to the extent of any benefit provided from the $5.9 Million Transfer.

## COUNT 11:   PARTNER LIABILITY (AUERBACH TRUST 1 AND AUERBACH TRUST 2)

139.    The Trustee incorporates his allegations above.

140.    Auerbach Partners is a limited partnership, the general partners of which are Auerbach Trust 1 and Auerbach Trust 2.

141.    Under applicable law, a general partner is jointly and severally liable with the limited partnership for the limited partnership's debts.

142.    Accordingly, the Trustee requests a judgment against Auerbach Trust 1 and Auerbach Trust 2 holding them jointly and severally liable for all awards otherwise awarded the Trustee herein against Auerbach Partners.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trustee requests that the defendants be cited to appear and to answer this Complaint and that he have judgment as follows:

(i)    avoidance of all transfers requested herein;

(ii)    recovery of all transfers requested herein by way of money judgment;

(iii)    money judgment against Goodman and Frinzi for their breaches of fiduciary duty;

(iv)    money judgment against Auerbach and Auerbach Partners, jointly and severally with Goodman and Frinzi, for their breaches of fiduciary duty;

(v)    money judgment against Auerbach and Auerbach Partners for unjust enrichment;

(vi)    reasonable attorney's fees to the extent provided for by applicable law;

(vii)    cancelation or return of any bonds held by Alliance or any other defendant not previously retired;

(viii)    judgment holding Auerbach Trust 1 and Auerbach Trust 2 jointly and severally liable for all awards against Auerbach Partners awarded herein;

(ix)    prejudgment and postjudgment interest to the extent provided by applicable law; and

(x)    such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this 7th day of July, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE**