**JORDAN, LYNCH & CANCIENNE PLLC**
Michael Cancienne (SBN 24055256)
Joseph W. Golinkin II (SBN 24087596)
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
Telephone: 713.955.4028

*Counsel for the Auerbach Defendants*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SCOTT M. SEIDEL, TRUSTEE; and GNET ATC, LLC<br><br>*Plaintiffs,*<br><br>v.<br><br>18920 N 11th, LLC; JAMES GOODMAN; JAMES FRINZI; STEVEN ZAKHARYAYEV; EVELINA PINKASOVA; PEOPLE NQ INC.; JJC & PEOPLE LLC; GDMN FAMILY INVESTMENTS 2, LLC,<br><br>*Defendants.* | Case No. 22-31641-mvl-7<br><br>(Chapter 7)<br><br>Adversary Proceeding No. 23-03090-mvl |

**DEFENDANTS HUDSON CLEAN ENERGY ENTERPRISES, LLC, ALLIANCE TEXAS HOLDINGS, LLC, NEIL Z. AUERBACH, JUDITH AUERBACH, AUERBACH PARTNERS, L.P., AND AUERBACH CHILDREN'S DYNASTY TRUST U/A/D OCTOBER 9, 2012'S MOTION TO DISMISS**

Defendants Hudson Clean Energy Enterprises, LLC ("Hudson"), Alliance Texas Holdings, LLC ("Alliance"), Neil Z. Auerbach ("Auerbach"), Judith Auerbach, Auerbach Partners, L.P. ("Auerbach Partners"), Auerbach Children's Dynasty Trust u/a/d October 9, 2012, and Auerbach Family Dynasty Trust u/a/d October 9, 2012 (collectively, the "Auerbach Defendants") file this Motion to Dismiss Plaintiff Scott Seidel's, as Trustee of Goodman Networks ("the Trustee"), Original Complaint under Rules 9 and 12 of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

This lawsuit centers around the allegation by the Trustee that in early 2022, Hudson, Auerbach, and/or Auerbach Partners purchased certain distressed bonds issued by Debtor from James Goodman for 35 percent of the bonds' face value, then sold those bonds to the Debtor for 53 percents of the bonds' face value. As a result, they made a profit while also allowing Debtor to retire more than $30 million of senior debt at a substantial discount. The Trustee ignores the retiring of the debt and attacks Hudson, Auerbach, and/or Auerbach Partners for making a profit by selling the Bonds to Debtor. In so doing, the Trustee not only ignores the obvious benefits Debtor received when it repurchased the Bonds, but also disingenuously suggests that the Auerbach Defendants negotiated a distinct third transaction—in effect, a kickback—with Debtor's insiders. But there was no kickback payment or third transfer, and the fact that the Debtor retired $30 million of senior debt when it repurchased the Bonds is a crucial fact that defeats the Trustee's claims against Hudson, Auerbach, and/or the Auerbach Partners.

Indeed, the Trustee has not stated *any* claims against the Auerbach Defendants. As discussed in more detail below, there were no fraudulent transfers (actual or constructive) because Debtor received reasonably equivalent value. Similarly, Debtor's civil conspiracy claim fails because the Trustee does not allege Auerbach or Auerbach Partners reached *any* meeting of the minds with Frinzi (at all) or a relevant meeting of the minds with Goodman to breach any fiduciary duty. Again, all that the Trustee alleges is that Hudson, Auerbach, or Auerbach Partners allowed the Debtor to retire $30 million of senior debt for 53 cents on the dollar. Finally, the Trustee has improperly attempted to drag two Auerbach Trusts and Judith Auerbach, as trustee for the trusts, into this lawsuit without alleging any facts against them. And because there is no claim for which the trusts could be vicariously liable, and no articulated basis for holding Judith Auerbach liable, the claims against these defendants should be dismissed.

## II.    FACTUAL BACKGROUND

### A.    The Company, Its Management, and the Senior Secured Bonds.

James Goodman and his family members are the beneficial owners of a majority of the outstanding equity issued by the Company. Until January 31, 2022, James Goodman served as the sole director of the Company. (ECF 1 at ¶ 21.) On February 1, 2022, "Goodman purported to resign as the director of the Debtor." (*Id.*) At that time, Goodman "owned more than $30 million of the Debtor's bonds." (*Id.*) Those bonds were due to mature on May 11, 2022. (*Id.* at ¶ 38.)

3

B.  **The Alliance Transactions.**

Around the same time, Debtor made it known that it was seeking to repurchase these bonds at a discount so that it could reduce the company's debt burden. But a major holder of these bonds—James Goodman—was reluctant to directly sell these bonds back to the company on which he previously served as a director for fear of having the transactions attacked should the company default. (*Id.* at ¶ 44.) This created an opportunity that the Auerbach Defendants cannily (and legally) exploited simultaneously negotiating two separate deals.

First, Alliance negotiated for the acquisition of certain Bonds held by Goodman Investment Holdings ("GIH") and Genesis Networks Inc. ("Genesis" and together with GIH, the "J. Goodman Entities") (such acquisition transaction (the "Alliance Purchase Transaction"). The Alliance Purchase BPA provides for the purchase by Alliance from the J. Goodman Entities of $31,746,617 in aggregate face value of Bonds for $11,131,953 (the "Purchase Transaction Price") in cash, or roughly 35.1% of the face value of the Bonds. (*Id.* at ¶ 1.)

Separately, the Auerbach Defendants negotiated and executed the Alliance Sale BPA provides for the sale by Alliance, and the purchase by the Company of $31,746,617 in face value of the Bonds for a purchase price of $17,032,060 (the "Sale Transaction Price"). (*Id.* at ¶ 58.) The Sale Transaction Price reflected a transaction at approximately 53.6% of the face value of the Bonds.

Thus, by executing these two agreements, the Auerbach Defendants effectively bought the Bonds for 35% of their face value and then resold those same Bonds to Debtor for 53% of their face value, realizing a profit of roughly $5.9 million.

4

(*Id.*) In purchasing back the Bonds at a reduced value, the Debtor was able to cancel over $14 million dollars of its secured debt.

### C. The Bankruptcy and subsequent proceedings.

On September 6, 2022, various petitioning creditors filed an involuntary petition (the "Petition") against the Company in the Bankruptcy Court. The Petition commenced a chapter 7 bankruptcy proceeding and created the Company's chapter 7 estate. The Bankruptcy Court entered an order for relief against the Debtor on December 12, 2022. The Bankruptcy Court appointed Scott M. Seidel as the Trustee of the Company and the Estate.

In connection with the Alliance Transactions, and in connection with various other transactions of the Company, on February 1, 2023, the Trustee deposed James Goodman, and on February 2, 2023, the Trustee deposed Frinzi. The Trustee subsequently filed this lawsuit. In it, the Trustee purports to assert eleven causes of action, including the following which are the subject of this Motion to Dismiss:

- Constructive Fraudulent Transfer (Bankruptcy Code section 548(a)(1)(B)) [Count 1, Count 4]

- Actual Fraudulent Transfer (Bankruptcy Code section 548(a)(1)(A)) [Count 1, Count 4]

- State Law Constructive Fraudulent Transfer (TUFTA[1] §§ 24.005(2), 24.006(a)) [Count 2, Count 4]

- State Law Actual Fraudulent Transfer (TUFTA 24.005(1)) [Count 2, Count 4]

- State Law Civil Conspiracy (Texas Common Law) [Count 9]

---

[1] "TUFTA" means the Texas Uniform Fraudulent Transfer Act, Chapter 24 of the Texas Business and Commerce Code.

5

- Unjust Enrichment (Texas Common Law) [Count 10]

- Partner Liability (Texas Common Law) [ Count 11], which is a collection count seeking to extend any disputed liability of Auerbach Partners, a limited partnership, to its general partners.

### III. STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a complaint for the "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009). In deciding a Rule 12(b)(6) motion, the Court should "accept all well-pleaded facts as true, drawing all reasonable inferences in the nonmoving party's favor." *Benfield v. Magee*, 945 F.3d 333, 336 (5th Cir. 2019). The Court "do[es] not, however, accept as true legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement." *Id.* at 336–37 (cleaned up).

Additionally, when a plaintiff's claims are grounded in fraud, the plaintiff must satisfy the heightened pleading requirements of Rule 9(b). Rule 9(b)'s particularity requirement generally demands the complaint identify the "who, what, when, where, and how" of the allegedly fraudulent content. *See United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). Rule 9(b) sets a "high bar." *Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev., Inc.*,

6

972 F.3d 684, 694 (5th Cir. 2020). "Naked assertions devoid of further factual enhancement will not suffice." *Sharifan v. NeoGenis Labs, Inc.*, No. 4:21-CV-01940, 2022 WL 3567010, at *5 (S.D. Tex. Aug. 18, 2022) (citing *In re Lindsey*, 733 F. App'x at 192.).

## IV. DISCUSSION

In its Complaint, the Trustee seeks to unwind what it claims are fraudulent transfers under state and federal law, and further seeks to hold the Auerbach Defendants liable for civilly conspiring with Frinzi and Goodman to breach a fiduciary duty and for unjust enrichment. The Trustee also alleges that Auerbach Trusts 1 and 2 are jointly and severally liable for any damages caused by Auerbach Partners. For the reasons set out below, the Court should dismiss the Trustee's claims against the Auerbach Defendants.

### A. There was no $5.9 million dollar transfer.

The Trustee bases multiple causes of action—including, but not limited to, Counts 1-2, 4, 7, 8-9, and 10—on the Auerbach Defendants' supposed involvement in something it calls "the $5.9 Million Transfer." (ECF 1 at ¶¶ 58, 60, 66, 67, 68, 73-76, 78, 79, 83-92, 107, 123-124, 130, 134, 137-138.) In describing this supposed transfer, the Trustee alleges that the Sale Transaction Price is somehow divided into two separate transfers: (1) the Purchase Transaction Price ($11,131,953), and (2) the Spread, which the Complaint refers to as the "$5.9 Million Transfer."

Of course, that is not what happened. As the Complaint itself explicitly concedes, there was only one transfer—for $17,032,060—to the Auerbach

7

Defendants. (ECF 1 at ¶ 57) Accordingly, there is no legal basis for bifurcating an otherwise singular transaction into a "Main Transfer" component and another component. In a wire transfer of funds, title to the funds passes from the transferor to the transferee when the funds are deposited into the transferee's bank account. *See, e.g.*, *Barnhill v. Johnson*, 503 U.S. 393, 400 (1992) (holding that "the debtor has implemented a mode, direct or *indirect* . . . of disposing . . . of property or . . . an interest in property" when the debtor loses its claim against the bank for the transferred funds and the transferee obtains the claim against the bank for the deposited funds) (emphasis in original); *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1277 (11th Cir. 2003) ("Title to funds in a wire transfer passes to the beneficiary bank upon acceptance of a payment order."); *United States v. BCCI Holdings (Luxembourg), S.A.*, 980 F. Supp. 21, 27 (D.D.C. 1997) ("Because an accepted transfer cannot be revoked without the consent of the beneficiary, and the beneficiary bank incurs an obligation to the beneficiary upon acceptance of the funds, the ownership interest in those funds must pass from the originator upon completion of the funds transfer.").

Once the Company transferred $17,032,060, and once such funds were deposited into Hudson's bank account (acting as agent for Alliance), control of the funds, and thus the interest in such property, passed to Alliance (with Hudson acting as agent). The later transfers made from Hudson (on behalf of Alliance) to GIH and Genesis were caused by Alliance using funds that had become Alliance's property, and the ultimate disposition of the Spread has absolutely no bearing on whether the

8

initial $17,032,060 transfer should be viewed as anything other than a single, unified transaction.

Accordingly, no "$5.9 Million Transfer" was made, and there is no basis to bifurcate the transactions in such manner. For this reason, the Trustee's causes of action asserted in Counts 1, 2, 4, and 5 fail.

**B.    The Trustee's Claims for Constructive Fraudulent Transfer in Counts 1, 2, 4, and 5 must be dismissed, as the Debtor cannot plausibly establish that it did not receive reasonably equivalent value.**

In Counts 1, 2, 4, and 5 of the Complaint, the Trustee seeks to unwind Debtor's decision to buy the Bonds based on its theory that the transaction was a "constructive fraudulent transfer" to Hudson, Alliance, Auerbach, and Auerbach Partners ("the Transfer Defendants") because Debtor did not receive "reasonably equivalent benefit" or "reasonably equivalent value" for what it paid. (ECF 1 at ¶¶ 78, 91, 107, 114.) These allegations fail as a matter of law.

Under section 548(a)(1)(b) of the Bankruptcy Code and under TUFTA sections 24.005 and 24.006(a), a transfer is constructively fraudulent when a debtor "voluntarily or involuntarily received less than reasonably equivalent value in exchange for [a] transfer or obligation . . . while the debtor was insolvent or became insolvent as a result of the transfer." *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 442 (Bankr. N.D. Tex. 2021). The Bankruptcy Code does not define "reasonably equivalent value" but defines "value" as the "satisfaction . . . of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). Similarly, under TUFTA,

9

"[v]alue is given for a transfer . . . if, in exchange for the transfer . . . an antecedent debt is secured or satisfied." TEX. BUS. & COM. CODE § 24.004(a).

Accordingly, bankruptcy courts routinely hold that, under the Bankruptcy Code and under TUFTA, "*a transfer made for or on account of an antecedent debt is by definition for a reasonably equivalent value*, and so cannot be a constructively fraudulent transfer." *In re Arabella Petroleum Co., 647* B.R. 851, 869 (Bankr. W.D. Tex. 2022) (emphasis added). Thus, "where a payment results in the corresponding dollar-for-dollar satisfaction of amounts owing by a debtor under a promissory note, then the payment is not avoidable as a constructively fraudulent transfer." *In re Jones*, No. 16-41283-ELM-7, 2019 WL 1167812, at *8 (Bankr. N.D. Tex. Mar. 11, 2019) (citations omitted). *See also In re Dual D Health Care Operations, Inc.*, No. 17-41320-ELM, 2021 WL 3083344, at *10 (Bankr. N.D. Tex. July 21, 2021) ("When a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt, . . . the question is easy because the debtor by definition receives reasonably equivalent value—indeed, *exactly* equivalent value . . .") (quoting *Matter of La. Pellets, Inc.*, 838 F. App'x 45, 50 (5th Cir. 2020) (emphasis in original); *In re Southeast Waffles, LLC*, 702 F.3d 850 (6th Cir. 2012) ("Typically, a dollar-for-dollar reduction in debt constitutes—as a matter of law—reasonably equivalent value . . . ."); *In re Sharp Intern. Corp.*, 403 F.3d 43 (2d Cir. 2005) (holding conveyance that satisfies an antecedent debt is not a fraudulent conveyance); *In re Elrod Holdings Corp.*, 421 B.R. 700 (Bankr. D. Del. 2010); *In re IFS Financial Corp.*, 417 B.R. 419, 441–42 (Bankr. S.D. Tex. 2009) (under relevant fraudulent conveyance law,

10

"value" includes satisfaction of an antecedent debt); *In re Central Ill. Energy Coop v. Camile's of Canton, Inc.*, 2011 WL 3666611, at * 4 (Bank. C.D. Ill. Aug. 22, 2011) (recognizing debtor's payment toward contractual obligations "discharged that liability and could not have been fraudulent . . . .").

The Trustee has not plausibly alleged that the Debtor did not receive reasonably equivalent value as part of the transactions at issue, and thus fails to state a claim for constructive fraudulent transfer under section 548(a)(1)(B) or under section 24.005(a)(2) of TUFTA. In fact, the Trustee's allegations show just the opposite. Payment of the Sale Transaction Price was a transfer made on account of an antecedent debt, which allowed the Company to retire over $31 million in face value of its outstanding bonds for only $17,032,060—*a more than dollar-for-dollar credit in reduction of its obligations*. (*Id.* at ¶ 58.) Under both the Bankruptcy Code and TUFTA, this transfer was "by definition" for reasonably equivalent value and therefore not avoidable as a constructively fraudulent transfer. *See In re Dual D Health Care Operations, Inc.*, 2021 WL 3083344, at *10 ("When a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt, . . . the question is easy because the debtor by definition receives reasonably equivalent value."). Therefore, for the Trustee's constructive fraudulent transfer claims fail as a matter of law.

    **C.    The Trustee's Actual Fraudulent Transfer Claims alleged in Counts 1, 2, 4, and 5 are Insufficiently Plead.**

The Trustee's allegations against the Transfer Defendants also fail to state a claim under both the Rule 9(b) and 8(a) standards for an actual fraudulent

11

transfer under section 548 of the Bankruptcy Code and under TUFTA. In fact, most of the Complaint's factual allegations against the Transfer Defendants consist of merely conclusory statements that must be disregarded, leaving only threadbare factual allegations that fail to establish the Trustee's actual fraudulent transfer claims. In addition, the Trustee's allegations of actual fraudulent transfer against the Transfer Defendants lack necessary elements to plead these claims.

Though the Fifth Circuit has left open whether Rule 9(b)'s heightened pleading standard applies to actual fraudulent transfer cases, several other circuits and courts in the Fifth Circuit have held it applies. *See Matter of Life Partners. Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir. 2019) (declining to decide the issue, but listing several courts in the Fifth Circuit and other circuits that have applied the heightened pleading standard in Rule 9(b) to fraudulent transfer claims). Following other circuits and federal district courts in the Fifth Circuit, this Court should apply Rule 9(b) to the Trustee's actual fraudulent transfer claims and require they be pleaded with particularity.

An actual fraudulent transfer claim under both section 548(a)(1)(A) and TUFTA § 24.005(a)(1) requires an "actual intent to hinder, delay or defraud." *In re: Brown Med. Ctr., Inc.*, 552 B.R. 165, 170 (S.D. Tex. 2016). One of the "badges of fraud" considered by courts to determine whether an actor acted with "actual intent to hinder, delay or defraud" under section 548 is knowledge of the financial condition of the debtor—specifically that the course of conduct occurred after the onset of financial difficulties or pendency or threat of suit by creditors. *Id.* at 170–71; *see In re Hannover*

12

*Corp.*, 310 F.3d 796, 800 (5th Cir. 2002) (discussing a transferee's knowledge as part of the § 548 assessment).

The Trustee has failed to allege this with particularity. Instead, it simply states that "Auerbach knew of the Debtor's insolvency . . . ." (ECF 1 at ¶ 1.) How? Well, the Trustee admits it is just guessing, stating "[u]pon information and belief, Auerbach too was made aware of [the Debtor ceasing operations and loss of customers], either through Goodman and/or Frinzi, or through his son, Shalom." (*Id.* at ¶ 35.) These allegations are insufficient. *See In re Superior Air Parts, Inc.*, 486 B.R. 728, 741 (N.D. Tex. 2012) ("Conclusory allegations made upon information and belief are not entitled to a presumption of truth . . . and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard." (citations omitted)). Absent factual, non-conclusory allegations to support the Auerbach Defendants' knowledge of the Debtor's insolvency, the Trustee cannot establish a claim against the Auerbach Defendants for actual fraudulent transfer.

Along the same lines, TUFTA § 24.005(b) contains various factors for consideration of whether there was actual intent to defraud. *In re: Brown*, 552 B.R. at 171–72. Some factors to consider include whether: (1) "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;" (2) "the transfer was of substantially all the debtor's assets;" and (3) "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ." TEX. BUS. & COM. CODE § 24.005(b)(4), (5), and (8). The Trustee does not allege that the Debtor had been sued or threatened with suit when the

13

alleged fraudulent transaction occurred. In fact, the Trustee concedes that the Bonds would not mature until months after the supposedly fraudulent transactions. (ECF 1 at ¶¶ 38, 49.) The Trustee also does not claim that the amounts involved in the Bond Purchase Agreement constituted substantially all of the Debtor's assets.

Lastly, the Trustee alleges in conclusory fashion that the Debtor did not receive "reasonably equivalent value" from the transaction, merely parroting the standard. (*Id.* at ¶¶ 78, 91, 114.) Nevertheless, the Trustee does not explain why or how this value is not reasonably equivalent. This allegation also belies the Trustee's other allegations that the transaction was done to allow the Debtor to "cancel as much of the Bonds as it could for less than face value, in order to relieve the Debtor of its debt burden at a discount" and allowed the Debtor to "retire more than $30 million in Bonds" for a little over half of value of those bonds. (*Id.* at ¶¶ 39, 60,) Given the Trustee has failed to allege with particularity the facts suggesting actual fraudulent intent, rather than constructive intent, the fraudulent transfer claims against the Transfer Defendants should be dismissed. *See In re Brown*, 552 B.R. at 172.

### D. The Trustee's Civil Conspiracy Claim Against The Auerbach Defendants Contradicts The Complaint's Factual Allegations.

The Trustee also purports to state a civil conspiracy claim against Auerbach and Auerbach Partners, and on that basis, asks the Court to enter "judgment against Auerbach, jointly and severally with Goodman and Frinzi, for the damages caused to the Debtor by Goodman's and Frinzi's breaches of fiduciary duty as otherwise described above, in an amount to be proven at trial." (ECF 1 at ¶ 135.)

14

"Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on *participation in an underlying tort*." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013). Therefore, to adequately plead a claim for civil conspiracy, the plaintiff must allege both a claim for conspiracy and a claim for an underlying tort. *Id.* The elements of a civil conspiracy include: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Tri v. J.T.T.*, 162 S.W.3d 552 (Tex. 2005). Here, the underlying tort the Plaintiffs claim is breach of fiduciary duty. "In Texas, '[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary duty existed between the plaintiff and the defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant." *Homoki*, 717 F.3d at 402-04 (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

The "meeting of the minds" element requires parties' agreement "to accomplish an unlawful purpose or to accomplish a lawful purpose *by unlawful means.*" *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). Additionally, there must be a "a preconceived plan and unity of design and purpose." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 809 (S.D. Tex. 2009) (*quoting Goldstein v. Mortenson*, 113 S.W.3d 769, 779 (Tex. App.—Austin 2003, no pet.)). Taking these elements together, "[a] conspiracy to defraud on the part of two or more persons means a common purpose, supported by concerted action to defraud,

15

that each has the understanding that the other has that purpose." *Goldstein*, 113 S.W.3d at 779. To satisfy the meeting of the minds requirement, "there must be a preconceived plan and unity of design and purpose." *Id.* Likewise, the Supreme Court of Texas held that for a civil conspiracy to arise, the parties must know about the harm or wrongful conduct at the beginning of the agreement. See *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 867 (Tex. 1968). A co-conspirator must know about the object and purpose of the conspiracy. *Id.*

The Trustee's civil conspiracy claim fails for multiple reasons. First, the Trustee does not allege that either Auerbach or Auerbach Partners ("the Conspiracy Defendants") ever had a meeting of the minds with Frinzi. Instead, it merely alleges that the Conspiracy Defendants knew that "Frinzi owed fiduciary duties to the Debtor, which [it] would breach by entering into the transactions described above[.]" (ECF 1 at ¶ 134.) As this Court recently observed in another adversary proceeding arising out of the Goodman Networks Bankruptcy, this omission defeats the Trustee's attempt to hold Auerbach and Auerbach Partners jointly and severally liable for Frinzi's supposed breaches of fiduciary duty. (Adv. Pro. No. 23-03072-MVL at ECF 21) (dismissing conspiracy claim because the alleged "unlawful acts were allegedly committed by a third-party who is not alleged to have been a co-conspirator.")

The Trustee also has not appropriately alleged that Auerbach conspired with Goodman to breach Goodman's fiduciary duties. Here, the Trustee alleges "Auerbach and Goodman had a meeting of the minds that both would exploit the situation for their personal benefits, with each agreeing to the enrichment of the

16

other, at the expense of the Debtor." (ECF 1 at ¶ 134.) But this allegation ignores the Auerbach Defendants role in the transaction, as well as the way the transactions were structured. Neither of the Conspiracy Defendants were ever Debtor's fiduciary, and their decision to purchase the Bonds from Goodman did not implicate Goodman's fiduciary duties to Debtor since *Goodman owned the Bonds*. Along the same lines, Auerbach sold the Bonds to Debtor, *not Goodman*, and the Trustee expressly alleges that Frinzi—*not Goodman*—"personally authorized and instructed" Debtor's purchase of the Bonds from the Conspiracy Defendants. (*Id.* at ¶ 128.) Given these facts and allegations, neither Auerbach nor Auerbach Partners conspired *with Goodman* to breach *Goodman's* fiduciary duties as the Trustee alleges in the Complaint.

Finally, Plaintiff cannot recover because it cannot establish any injury to the Bankruptcy Estate. The Alliance Sale Transaction eliminated more than $31 million of senior secured debt that creditors "would otherwise have been entitled to share pro rata in the distribution of [the] bankruptcy estate." *Matter of Moreno*, 892 F.2d 417, 420 (5th Cir. 1990). The Debtor benefited from the Alliance Sale Transaction, leaving more funds available for distribution to unsecured creditors than would have been available if the transaction had never occurred.

### E. The Trustee has no claim for Unjust Enrichment.

The Trustee purports to state a claim against Hudson, Auerbach, and Auerbach Partners for Unjust Enrichment based on their supposed receipt of the "$5.9 Million Transfer." (ECF 1 at ¶ 137-138.) As discussed, there was no $5.9 Million

17

Transfer, and even if there were, the Trustee's theory is not actionable. "Unjust enrichment occurs when [a party] has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Crawford v. Bleeden*, No. 3:21-CV-2181-X, 2023 WL 2414009, at *6 (N.D. Tex. Mar. 8, 2023) (citations omitted). But the unjust enrichment theory "does not operate to rescue a party from the consequences of a bad bargain." *King v. Baylor Univ.*, 46 F.4th 344, 367 (5th Cir. 2022) (citations omitted). Specifically, "the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.*; *see also In re IFS Fin. Corp.*, No. 02-39553, 2007 WL 1308321, at *5 (Bankr. S.D. Tex. May 3, 2007) (recognizing the "unjust enrichment claim is precluded if it seeks relief that is inconsistent with the contract").

The Alliance Sale Transaction was executed through a valid agreement under which Debtor retired over $30 million of senior secured debt in exchange for $17,032,060. The Debtor undeniably achieved a legitimate business purpose at the price that it offered, since it extinguished a large amount of debt at a discount. Thus, at most, this business deal was more expensive to the Debtor than a hypothetical deal with a different bond seller, but the Debtor's potential ability to have bought the Bonds back at a greater discount does not give rise to a viable claim for unjust enrichment.

### F. Plaintiff has no claim for Partnership Liability.

Finally, the Court should dismiss the Trustee's claim for "Partnership Liability" against Auerbach Trusts 1 and 2. In this claim, the Trustee simply seeks

18

to hold the Auerbach Trusts jointly and severally liable for any damages caused by Auerbach Partners. (ECF 1 at ¶ 142.) This claim, however, should be dismissed without prejudice since the Trustee has not stated a claim against Auerbach Partners.

## V. CONCLUSION

In sum, the Trustee has not asserted any viable claim against any of the Auerbach Defendants. For that reason, the Court should dismiss each of the Trustee's claims against the Auerbach Defendants.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: *s/ Jeb Golinkin*
    Michael Cancienne
    State Bar No. 24046330
    Joseph ("Jeb") W. Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Ste. 2300
    Houston, Texas 77056
    713-955-4020 (Telephone)
    713-955-9644 (Fax)
    mcancienne@jlcfirm.com
    jgolinkin@jlcfirm.com

ATTORNEYS FOR HUDSON CLEAN ENERGY ENTERPRISES, LLC, ALLIANCE TEXAS HOLDINGS, LLC, NEIL Z. AUERBACH, JUDITH AUERBACH, AUERBACH PARTNERS, L.P., AND AUERBACH CHILDREN'S DYNASTY TRUST U/A/D OCTOBER 9, 2012

**CERTIFICATE OF SERVICE**

       I hereby certify that on this 20th day of February, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all counsel of record in this case.

                                        */s/ Jeb Golinkin*
                                        Joseph W. Golinkin II