**IN THE UNITES STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| GOODMAN NETWORKS, INC., | § | Case No. 22-31641-mvl7 |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, *et al.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 23-03090-mvl |
| | § | |
| HUDSON CLEAN ENERGY | § | |
| ENTERPRISES, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**TRUSTEE'S RESPONSE TO DEFENDANTS HUDSON CLEAN ENERGY**
**ENTERPRISES, LLC, ALLIANCE TEXAS HOLDINGS, LLC, NEIL A. AUERBACH,**
**JUDITH AUERBACH, AUERBACH PARTNERS, L.P., AND AUERBACH**
**CHILDREN'S DYNASTY TRUST U/A/D OCTOBER 9, 2012,'S MOTION TO DISMISS**

Davor Rukavina, Esq.
Tex. Bar No. 24030781
Thomas D. Berghman, Esq.
Tex. Bar No. 24082683
Julian P. Vasek, Esq.
Tex. Bar No. 24070790
**MUNSCH HARDT KOPF & HARR P.C.**
500 N. Akard St., Ste. 4000
Dallas, Texas 75201
214-855-7500
drukavina@munsch.com
tberghman@munsch.com
jvasek@munsch.com

**COUNSEL FOR SCOTT M. SEIDEL,**
**CHAPTER 7 TRUSTEE**

TO THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE:

Scott M. Seidel, chapter 7 trustee (the "Trustee") for Goodman Networks, Inc. (the "Debtor"), files this his *Trustee's Response to Defendants Hudson Clean Energy Enterprises, LLC, Alliance Texas Holdings, LLC, Neil A. Auerbach, Judith Auerbach, Auerbach Partners, L.P., And Auerbach Children's Dynasty Trust U/A/D October 9, 2012,'s Motion to Dismiss*, in support of which the Trustee would respectfully show as follows:

## I.   SUMMARY

1.      The Movants' arguments rest on a fundamentally false premise that insults the intelligence of the Court, the Trustee, and the Estate's creditors: that the Movants paid for and owned the Bonds that they "sold" to the Debtor.  Perhaps it would have been a shrewd business decision to buy the Bonds and then resell them for a massive profit.  But that is not what happened. In less than one day, the money flowed from the Debtor to GIH, Genesis, and Auerbach Partners, and the Bonds flowed from GIH and Genesis to the Debtor.  No other money or property changed hands.  The Movants never used any of their own money, never took any investment risk, and never did anything at all but sign some paperwork to act as a shill.  In exchange for their role in concealing the true nature of an extracontractual, insider transaction, the Movants received $5.9 million of the Debtor's money, never having purchased the Bonds they allegedly "sold".

2.      This is a Court of equity empowered to look behind the form of a transaction to the substance, including by collapsing what the Movants disingenuously assert are multiple, separate transactions.  This is also a Court that will not be "fooled" by the form or structure that co-conspirators chose to give a transaction to hide its true nature.  The law of fraudulent transfer exists to unwind fraudulent transfers regardless of how much effort went into masking the fraud.  For the

Defendants to argue they did anything to "earn" $5.9 million, or that the Debtor received anything of value from them in exchange, really is an affront to logic, equity, and common sense.

3.      The Debtor knew it could purchase the Bonds for some $11 million because that was the price Goodman was willing to accept the same day the Debtor bought them. But for whatever illegitimate reason, Frinzi did not pay that price.  Instead, he paid his friends $5.9 million *more* so act as a shill.  In other words, the Debtor overpaid by $5.9 million.  The Movants misdirect the Court to the face value of the Bonds, but that was not their actual value.  What the Debtor was buying, and what the Movants were funneling, was a security, and that security had a value less than the face amount.  The Debtor paid over fifty percent (50%) *more* than that value.  It will be interesting indeed for the Movants, under penalty of perjury and consistent with Rule 11, to explain to the Court what really happened, and what they really did to earn the $5.9 million.

## II.    BACKGROUND

4.      On November 7, 2023, the Trustee filed his *Original Compliant* (Dkt. No. 1, the "Compliant"), which sets forth claims and causes of action against the following defendants (the "Defendants"): Hudson Clean Energy Enterprises, LLC ("Hudson"), Alliance Texas Holdings, LLC ("Alliance"), Neil Z. Auerbach ("Neil Auerbach"), Judith Auerbach ("Judith Auerbach"), Auerbach Partners, L.P. ("Auerbach Partners"), James Goodman ("Goodman"), James Frinzi ("Frinzi"), Goodman Investment Holdings, LLC ("GIH"), Genesis Networks, Inc. ("Genesis"), Genesis Networks Global Services, LLC ("GNGS"), Auerbach Children's Dynasty Trust U/A/D October 9, 2012 (the "Children's Trust"), and Auerbach Family Dynasty Trust U/A/D October 9, 2012 (the "Family Trust").

5.      At a high level, the Complaint alleges the Defendants engaged in a conspiracy to enrich themselves at the expense of the Debtor and its creditors by engaging in a shill transaction to mask insider self-dealing and breach of contract.  Specifically, Goodman and Frinzi sought to

continue a general pattern of looting the Debtor for their own benefit by cashing out insider bonds in breach of contract and in preference to non-insider creditors, and they directly or indirectly enlisted Hudson, Alliance, Auerbach Partners, Neil Auerbach, Judith Auerbach, the Family Trust, and the Children's Trust (collectively, the "Movants") to play various roles aimed at disguising the transactions' true nature.

6.      On February 3, 2022, in furtherance of this scheme, the following events transpired, **all within a 24-hour period**:

a)      GIH, Genesis, and Alliance entered into a Purchase Agreement[1] under which Alliance agreed to purchase (i) the GIH Bonds with a face value of $30,146,617.00 for the GIH Purchase Price of $10,570,912.00 and (ii) the Genesis Bonds with a face value of $1,600,000.00 for the Genesis Purchase Price of $561,041.00. Compl. ¶¶ 40-41, 49-51. However, Alliance did not have the funds to pay the GIH Purchase Price or the Genesis Purchase Price, Compl. ¶ 52, and Alliance did not, in fact, pay these amounts from its own funds. *See*, *e.g.*, Compl. ¶¶ 1, 47, 99.

b)      Alliance and the Debtor entered into another version of the Purchase Agreement under which the Debtor agreed to purchase the GIH Bonds and the Genesis Bonds (collectively, the "Bonds") from Alliance for $17,032,060.00—*i.e.*, $5,900,107.00 *more* than under the other version of the Purchase Agreement. Compl. ¶ 62. Again, however, Alliance had not paid for the Bonds before entering into this version of the agreement, so it did not own the bonds and could not sell them. *See*, *e.g.*, Compl. ¶¶ 1, 47, 99. Moreover, this version of the agreement was not shared with the parties' attorneys. Compl. ¶ 64.

c)      The Debtor transferred $17,032,060.00 to Hudson as Alliance's agent. Compl. ¶¶ 54-55, ¶ 57. Hudson immediately transferred $10,570,912.00 to GIH, $561,041.00 to Genesis, and $5,900,107.00 to Auerbach Partners (the "$5.9 Million Transfer"). Compl. ¶¶ 57, 63.

7.      In other words, if one disregards the shills—*i.e.*, Alliance and Hudson—who did nothing but push paper (they did not deploy any capital or place any of their own funds at risk), then on February 3, 2022, the Debtor transferred $10,570,912.00 to GIH in exchange for the GIH

---

[1] Capitalized terms not defined herein have the meaning attributed to them in the Complaint.

Bonds, $561,041.00 to Genesis in exchange for the Genesis Bonds, and $5,900,107.00 to Auerbach Partners in exchange for absolutely nothing.  This, of course, begs the question, why involve Alliance, Hudson, and Auerbach Partners at all?

8.      The Complaint plainly answers this question.  GIH and Genesis were controlled by Goodman.  Compl. ¶¶ 25 – 28.  Goodman also controlled the Debtor.  Compl. ¶¶ 21 – 24.  This meant GIH, Genesis, and the Debtor were insider-affiliates, and Goodman could not cause the Debtor to cash out insider-held bonds in preference to non-insider creditors, given that he knew the Debtor was deeply insolvent and contractually prohibited from doing so.  Compl. ¶¶ 42 – 43. He and Frinzi therefore involved the Auerbachs and their various entities—*i.e.*, the Movants—to act as shills in exchange for a $5.9 million kickback.

9.      The Movants now ask this Court to dismiss all the Trustee's claims against them (Dkt. No. 10, the "MTD").  They disingenuously attempt to paint this patently fraudulent transaction as merely no more than "cannily (and legally) exploit[ing]" an incredibly lucrative business opportunity in which they made $5.9 million in a single day without investing or otherwise putting at risk even one penny of their own money.  But the Court should deny their MTD, open the doors to discovery, and let them make that preposterous claim under oath in a deposition or in open court.  The detailed, 26-page Complaint provides the Movants more than fair notice of the Trustee's claims against them.

### III.    ARGUMENT & AUTHORITIES

#### A.    MOTION TO DISMISS STANDARDS

10.     The Fifth Circuit has aptly summarized the dismissal standard under rule 12(b)(6) as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929

(2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. The facts alleged must "be enough to raise a right to relief above the speculative level," but the complaint may survive a motion to dismiss even if recovery seems "very remote and unlikely." *Twombly*, 550 U.S. at 555–56, 127 S. Ct. 1955 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)). Thus, "the complaint must provide more than conclusions, but it 'need not contain detailed factual allegations.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011) ).

*Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018).

11.     It bears emphasizing that, when considering a motion to dismiss under rule 12(b)(6), a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "'All questions of fact and any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor.'" *Vardeman v. City of Houston*, 55 F.4th 1045, 1050 (5th Cir. 2022) ("quoting *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001)). Rule 12(b)(6) motions are viewed with disfavor and rarely granted. *Lormand*, 565 at 232. The Court should therefore "adhere to the Supreme Court's admonition that '[t]he plausibility standard is not akin to a 'probability requirement' ....'" *See Innova Hosp. San Antonio*, 892 F.3d at 729 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955)).

## B.    BURDENS OF PROOF ON VALUE

12.     The question of "value" comes into play twice with respect to the Trustee's Complaint and the Movants' arguments. First, there is the question of value with respect to a constructively fraudulent transfer, where the Trustee bears the burden of proving the Debtor

received less than reasonably equivalent value for the transfer.   Second, there is the question of value with respect to the affirmative defense of a transferee that gave value for the transfer.

13.     With respect to reasonably equivalent value, this is the Trustee's burden of proof. *See, e.g., In re L&D Interests Inc.*, 350 B.R. 391, 399 (Bankr. S.D. Tex. 2006).   "This provision ensures that there is no great disparity between the value of the goods exchanged. But it does so, most importantly, from the perspective of the transferor." *In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002).   This is a fact-laden inquiry, but it is clear that a debtor need not receive a dollar-for-dollar exchange.   *See, e.g., In re Calvillo*, 263 B.R. 214, 220 (Bankr. W.D. Tex. 2000). The primary focus is on the net effect of the transaction on the debtor's estate and funds available to the unsecured creditors.   *See, e.g., Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004).   "The debtor need not receive a dollar-for-dollar benefit, but rather a benefit within the range of an arm's-length transaction." *In re Victory Medical Ctr. Mid-Cities LP*, 601 B.R. 739, 748 (Bankr. N.D. Tex. 2019).[2]   Stated differently, courts "look to see if what the debtor received was 'in the range of a reasonable measure of the value of what the debtor transferred.'" *Id*. at 749.

14.     On the issue of reasonably equivalent value, the Trustee discusses at length the doctrine of "collapsing" below.   For now, he will simply point out the obvious.   First, the Debtor (through Frinzi, whose knowledge is imputed to the Debtor), knew that Goodman was selling his Bonds for 35%.   The issue of the face amount of the Bonds, at that point in time, is not controlling, since Goodman was selling them for 35%.   Yet, under the Movants' analysis, the Debtor paid 53% for the Bonds, knowing that it was paying $5.9 million more than they cost.   That is well outside

---

[2]     This is also the statutory definition under TUFTA: "Reasonably equivalent value includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Comm. Code Ann. § 24.004(d).

the "range of a reasonable measure," as the Debtor paid over than fifty percent (50%) more for the

Bonds than what they cost.  Second, pursuant to the Trustee's well-pled facts, this was not an

"arm's length" transaction.  Third, and most critically, the Debtor was not paying $5.9 million for

the Bonds, but rather for the use of the Movants as a shill to hide and conceal the transaction.

15.    The question really is a simple one: what value did the Debtor receive for

transferring $5.9 million to the Movants?  It is a question that the Movants do not address and do

not want to address, because the answer is obvious: nothing.  The Debtor could have purchased

the Bonds and did purchase the Bonds for $11 million.  The $5.9 million was for something entirely

different, whether a "gift" from Frinzi to his friends or whether to employ the Movants as a "shill,"

but it was not for the Bonds themselves.  Thus, and especially when all reasonable inferences are

drawn in the Trustee's favor, at this stage the Trustee has adequately and properly pled the

elements of a constructively fraudulent transfer (and see the discussion below regarding

collapsing).

16.    The second way that "value" is important concerns the section 548(c) affirmative

defense:

> a transferee or obligee of such a transfer or obligation that takes for value and in
> good faith has a lien on or may retain any interest transferred or may enforce any
> obligation incurred, as the case may be, to the extent that such transferee or obligee
> gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).  TUFTA contains a virtually identical affirmative defense.  *See* TEX. BUS. &

COMM. CODE ANN. § 24.009(a).

17.    Section 548(c) (and its TUFTA equivalent) is of course an affirmative defense.  *See*

*In re Positive Health Mgt.*, 769 F.3d 899, 901 (5th Cir. 2014).  It is one on which the Movants bear

the burden of proof.  *See In re Hannover Corp.*, 310 F.3d 796, 799 (5th Cir. 2002).  The Movants

have not even filed an answer in order to assert this affirmative defense and, without even filing

such an answer, they cannot prove a non-existant affirmative defense as a matter of law on a Rule 12(b)(6) standard.  Dismissal of a complaint under Rule 12(b)(6) based on an affirmative defense is appropriate "only if an affirmative defense or other bar to relief appears on the face of the complaint."  *Garrett v. Commonwealth Mortg. Corp. of America*, 938 F.2d 591, 594 (5th Cir. 1991).

18.     In this respect, the Movants also complain that the Trustee characterizes the $5.9 Million Transfer as a "transfer," arguing that the only transfer at issue is the transfer of $17,032,060.  *See* Motion at p. 7.  Perhaps, but in reducing the transfer to $5.9 million as against the Movants, all that the Trustee has done is to honestly and ethically acknowledge that the Debtor did receive a little over $11 million in value for the Bonds (subject to the argument that $1.6 million of the Bonds remain to be transferred to the Debtor or cancelled).  The Trustee should not be penalized for this; he could have sued the Movants for the full $17 million and left it to them to prove that *any* return value was given, but he has taken the high road here.

## C.   ACTUAL FRAUDULENT TRANSFER

19.     Most if not all of the Movants "value" arguments go to the Trustee's constructive fraudulent transfer claims.  But the Trustee has also sued the Movants for actual fraudulent transfer. In that respect, reasonably equivalent value is only one of the "badges of fraud," and the Trustee has pled various other "badges of fraud."

20.     As pointed out above, to the extent that the Movants argue that "value" given the Debtor also negates the Trustee's actual fraudulent transfer claims, that is a bar to relief only if the affirmative defense "appears on the face of the complaint."  *See Garrett*, 938 F.3d at 594. However, unlike with respect to reasonably equivalent value, in this context the value given is to be determined from the transferee's perspective: value for purposes of the affirmative defense

"must be assessed from the perspective of what the transferee gave up rather than what the debtor received." *In re Positive Health Mgt.*, 769 F.3d 899, 901 (5th Cir. 2014).

21.     This is important.  First, at the time of the transfer, the Movants did not even own the Bonds; at that point in time they had no value to give.  Second, and more substantively, because the question is the value that the Movants gave, they will have to demonstrate the value that the Bonds had.  They argue that the Debtor received full value for the retirement of the Bonds, but they fail to argue—much less demonstrate—that this is the value they gave up.  *See id*.  Clearly, when viewed from the Movants' perspective, the Bonds are not taken at face value.  *See, e.g., In re Clements Mfg. Liquidation Co. LLC*, 521 B.R. 231, 252 (Bankr. E.D. Mich. 2014) (holding that value of transferred accounts receivable is not determined by their face amount but rather by their actual value).

22.     Thus, what matters is the actual value of the Bonds that the Movants gave up.  Here, and taking all reasonable inferences in the Trustee's favor, the only suggestion of that value is 35% of the face amount of the Bonds, as that is the price Goodman simultaneously accepted for the Bonds.  At most, therefore, the affirmative defense appears on the face of the Complaint to the extent of some $11 million (and again, the Trustee has not sued the Movants for that), but nowhere on the face of the Complaint does any value for the $5.9 million appear.  And the Movants surely cannot allege that a nanosecond of their time, in a transaction in which they faced no risk and used none of their own capital, was worth any value at all.  Again, the issue is not the debt underpinning the Bonds.  The Movants did not purchase that debt in order to hold it, but rather to immediately sell it to the Debtors or to retire the Bonds.  What they were purchasing and immediately selling (under their theory of the case, of course) was a security, and that security had a defined, market value (which is outside of the Complaint, but on which the reasonable inference was that the security had a value of 35% of face amount).

23.     And, equally as importantly, the Trustee's well-pled allegations negate any possible "good faith" of the Movants, whether under section 548(c) or 550 of the Bankruptcy Code, or under TUFTA.  The opposite is alleged.  Again, any affirmative defense of value does not conclusively appear on the face of the Complaint and it will be for the Movants to plead such an affirmative defense and then to prove it, together with sworn testimony and upon discovery (which, the Trustee is confident, will demonstrate the bad faith of the Movants).

24.     Thus, in no event should the Court dismiss the Trustee's actual fraudulent transfer claims under the Movants' theory that the value the Debtor received for the transfer or retirement of the Bonds negates all of the Trustee's causes of action.

25.     The Movants argue the Trustee has failed to satisfy rule 9(b) with respect to his intentional fraudulent transfer claims.  As an initial matter, while some courts in this Circuit apply rule 9(b) to such claims, others do not.  According to Judge Fish, "the trend in this district is to conclude that fraudulent consideration claims are not subject to Rule 9(b)'s pleading requirements." *U.S. Bank N.A. v. Verizon Comms., Inc.*, 3:10-CVC-1842-G, 2012 WL 3100778, *11 (N.D. Tex. July 31, 2012) (citing *Janvey v. Alguire*, No. 3:09–CV–0724–N, 2011 WL 7047035, at * 10 (N.D. Tex. Sept. 6, 2011) (Godbey, J.); *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09–CV–0572–L, 2009 WL 5173954, at * 10 (N.D. Tex. Dec. 31, 2009) (Lindsay, J.)).

26.     Judge Fish held, "there is 'no principled reason for applying Rule 9's pleading requirements to [the plaintiff's] fraudulent transfer claims.'"  *Id.* (quoting *Janvey*, 2011 WL 7047035 at * 10).  "This is because fraud is simply not an aspect of a fraudulent transfer claim." *Id.*  "In a fraud claim, the plaintiff must show that the defendant had both 'knowledge' of the fraud and an 'intention to induce reliance.'"  *Id.*  "In contrast, in a fraudulent transfer claim, the defendant's intent or conduct is irrelevant." *Id.*  So, irrespective of whether rule 9(b) applies, the

Movants' argument concerning Auerbach's knowledge on p. 13 of the MTD makes no sense.  "The statute focuses on the transferor's intent, not the transferee's."  *Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 264 (5th Cir. 2012).

27.     Even if rule 9(b) applies, Judge Gargotta found an appropriate middle ground regarding how to apply it to fraudulent transfer claims:

> Rule 7009(b) distinguishes between pleading the circumstances of the alleged fraud and the conditions of the defendant's mind at the time of the alleged fraud. Thus, the heightened standard requiring the specifics of the "who, what, when, where, and how" of the alleged fraud applies to the circumstances surrounding the fraud, not the conditions of the defendant's mind at the time of the alleged fraud. Therefore, to the extent that the Trustee needs to plead the how element, the Trustee need only plead the logistics of the transfer—for example, how the transfer was executed or the means by which the transfer occurred—not how the transfer was made with actual intent to hinder, delay, or defraud.

> *    *    *

> Rule 9(b) permits "malice, intent, knowledge, and other conditions of a person mind [t]o be alleged generally." Therefore, to properly plead the actual intent to hinder, delay, or defraud element of § 548(a)(1)(A), the Trustee must plead such intent with factual allegations that show that relief is plausible. *See Iqbal*, 556 U.S. at 677–78, 129 S.Ct. 1937 (explaining that conditions of a person's mind under Rule 9(b) be plead according to Rule 8 standards.).

in *Rodriguez v. Cyr (In re Cyr)*, 602 B.R. 315, 328-29 (Bankr. W.D. Tex. 2019).

28.     "The Fifth Circuit has recognized that reliance on badges of fraud is permissible for establishing fraudulent intent …."  *Id.* at 329 (citing *In re Soza*, 542 F.3d 1060,1067 (5th Cir. 2008).  "It is not necessary that all or any one of the badges of fraud be established to support a finding of actual fraudulent intent by the debtor; however, more than one badge of fraud must be shown to establish actual fraudulent intent."  *Id.*  "Because badges of fraud are used to establish actual intent to hinder, delay, or defraud—the condition of the debtor's mind at the time of the transfer—factual allegations regarding badges of fraud need only comply with Rule 8 and [the Trustee need only] plead factual allegations that demonstrate relief is plausible.  *Id.* at 330.

---

29.    Badges of fraud include, among other things, (a) "the lack or inadequacy of consideration;" (b) "the family, friendship or close associate relationship between the parties;" and (c) "the general chronology of the events and transactions under inquiry." *Soza*, 542 F.3d at 1067. Other badges of fraud include (d) "the transfer or obligation was concealed;" and (e) "the debtor was insolvent …." TEX. BUS. & COMM. CODE ANN. § 24.005(b)(3), (9).  The Trustee has plausibly alleged each of these in the Complaint:

    a)  *As discussed above, the Debtor did not receive anything in exchange for the $5.9 Million Transfer.*  Compl. ¶¶ 1 ("Goodman entered into an agreement with Auerbach whereby Auerbach, through his entities, would purchase the bonds with the Debtor's funds—not his own funds—and would keep $5.9 million for himself with no benefit whatsoever to the Debtor"); ¶ 58 ("difference of $5,900,107.00 (the "$5.9 Million Transfer") was intended to benefit and enrich Auerbach for acting as the intermediary to hide the true nature of the transaction"); ¶ 67 ("for no money of their own and for no risk of their own, they had the Debtor fund the purchase and then make an immediate $5.9 million profit").

    b)  *The Complaint alleges the parties are long-time friends.*  Compl. ¶ 33 ("Auerbach, Goodman, and Frinzi, directly and through their respective families, have been friends for a long period of time and, upon information and belief, have engaged in business together. Furthermore, upon information and belief, Zakharyayev is friends with Auerbach's son, Shalom Auerbach ("Shalom"), and has done business with him. Thus, all of the individuals involved in this matter have personal, familial, and/or business relationships predating the Debtor").

    c)  *The general chronology—i.e., the fact that the Movants made an alleged $5.9 million profit in less than 24 hours without investing a penny—raises huge red flags.*  Compl. ¶ 46 ("Goodman and Auerbach (directly or through agents) entered into an agreement whereby each would enrich himself at the expense of the Debtor: the Debtor would fund a purchase of the GIH Bonds and Genesis Bonds for 35 cents on the dollar, and Auerbach would make a large premium for acting as some kind of intermediary to conceal the transaction and to participate as a Straw Man, to hide the fact of actual payment or repayment of the Bonds to Goodman and his entities"); ¶ 47 (Auerbach … was not using his own funds to purchase the Bonds"); ¶ 49-67 (detailing the series of events that took place on Feb. 3, 2022).

    d)  *The express purpose of engaging Alliance as a middle man was to conceal Goodman's efforts to cash out his insider-held bonds in preference to non-insider creditors.*  Compl. ¶ 36 ("Commencing in late 2021, and through early 2022, however, the Debtor had amassed tens of millions of dollars in

cash on hand, mainly because it stopped paying its largest creditors, including FedEx. The question for Goodman was how to exploit this cash for his or his other companies' and friends' benefit, before creditors would exercise their remedies and the cash would be seized); ¶ 42 ("Goodman did not want the Debtor to simply pay on the Bonds, because he would then have to share in the proceeds of such payment with other holders of the Bonds"); ¶ 43 ("Goodman knew that he could not direct payments by the Debtor on the GIH Bonds and the Genesis Bonds and that he, GIH, and UFS would face potential liability for breach of contract if he did so"); ¶ 44 ("Frinzi encouraged Goodman to make some money on these Bonds, and advised that a third party be used for the transaction"); ¶ 45 ("the intent in using a third party was to hide the true nature of the transaction from the Debtor's creditors, make it more difficult to claw-back any payments through the use of intermediaries and conduits, and for Goodman to avoid potential breach of contract claims related to the UFS agreement"); ¶ 47 ("rather than Auerbach buying the Bonds with his funds, or rather than the Debtor redeeming or paying the Bonds directly, Goodman, Frinzi, and Auerbach agreed to hide the true nature of the persons involved and the payments and transactions involved"); ¶ 47 ("Auerbach knew or should have known that he would not be offered millions of dollars in profit, without putting in any money or assuming any risk, except as a payment to participate in the fraudulent and concealed nature of the transaction").

e) *The Debtor was insolvent.* Compl. ¶ 24 ("As of February 1, 2022, and at all times material hereto, the Debtor was insolvent"); *see also* Compl. ¶ 35 ("the Debtor lost its largest customer in October 2021, had stopped paying Federal Express Logistics (a major creditor) tens of millions of dollars and knew that FedEx would soon begin to exercise its remedies, had stopped paying other large creditors and vendors, and knew that it would soon be unable to make payment on the Bonds"); ¶ 42 ("Goodman knew that the Debtor was insolvent, would not be able to repay the Bonds and would shortly default on the Bonds"); 47 ("Auerbach knew or should have known that the Debtor was insolvent").

30.     In light of these allegations and others set forth in the Complaint, the Trustee has more than adequately pled his claims for actual fraudulent transfer under both the Bankruptcy Code and TUFTA, based on the applicable pleading standards, even if rule 9(b) applies.

**D.    THE COURT SHOULD COLLAPSE THE FRAUDULENT TRANSACTIONS AND DISREGARD THE FORM THE PARTIES USED TO HIDE THE TRUTH.**

31.     This is a Court of equity that exists to see through the form of a transaction to its substance.  This Court is empowered not to permit itself to be "fooled" by the form of any given transaction, and it is not bound by any such form.  Here, all legal arguments aside for the moment,

there can be no question that the Movants made an ill-gotten gain of $5.9 million when they put no capital of their own into the transaction, assumed no risk of holding and collecting the Bonds, and were paid only and solely to act as a shill to hide and conceal the transaction from the Debtor's creditors, or by way of a "gift" from Frinzi to his friends to impress upon them how profitable his friendship can be.  There is no question that the Debtor lost $5.9 million in the transaction, because the price of the Bonds was 35% and not 53%.  The $5.9 million was "dirty," plain and simple.  Is the Court now to be fooled into concluding that everything was above-board, ethical, and transparent?  Of course not.

32.     The Movants argue "there is no legal basis for bifurcating an otherwise singular transaction into a 'Main Transfer' component and another component."  MTD p. 8.  But they cite various cases in support that say no such thing.  Those cases deal with title to wired funds.  *See Barnhill v. Johnson*, 503 U.S. 393, 400 (1992) (holding that "the debtor has implemented a mode, direct or *indirect* . . . of disposing . . . of property or . . . an interest in property" when the debtor loses its claim against the bank for the transferred funds and the transferee obtains the claim against the bank for the deposited funds) (emphasis in original); *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1277 (11th Cir. 2003) ("Title to funds in a wire transfer passes to the beneficiary bank upon acceptance of a payment order."); *United States v. BCCI Holdings (Luxembourg), S.A.*, 980 F. Supp. 21, 27 (D.D.C. 1997) ("Because an accepted transfer cannot be revoked without the consent of the beneficiary, and the beneficiary bank incurs an obligation to the beneficiary upon acceptance of the funds, the ownership interest in those funds must pass from the originator upon completion of the funds transfer.").

33.     The Court need not employ anything beyond common sense to conclude a single wire transfer might contain more than one component.  A customer might, for example, pay past-due invoices and pre-pay for future goods with one wire.  If that customer later filed for

bankruptcy, the part of the wire attributable to past-due invoices might constitute a preference, whereas the balance would not. *See* 11 U.S.C. § 547(b)(2) (transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made" to constitute a preference). Surely the Movants do not mean to suggest the Court has no power to bifurcate the wire in this hypothetical or other similar situations.

34.   Even setting aside the Movants' failure to employ common sense, they also evidently failed to identify the doctrine of collapsing multiple related transactions:

> In comparing the value received with the value transferred, courts generally limit their inquiry to the specific transaction that the plaintiff seeks to avoid. However, where there are multiple related transactions, courts will sometimes "collapse" the transactions and consider the transactions as one integrated transaction for purposes of assessing whether the debtor received reasonably equivalent value. *United States v. Tabor Court Realty Corp.*, 803 F. 2d 1288, 1301–03 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005, 107 S. Ct. 3229, 97 L. Ed. 2d 735 (1987). *See also Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F. 2d 206, 212–13 (3d Cir. 1990); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635–36 (2d Cir. 1995); *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) (quoting In re Sunbeam Corp., 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the 'formal structure erected and labels attached' make them appear distinct.")). Whether multiple distinct transactions should be "collapsed" and viewed as a single integrated transaction turns on the substance rather than the form of the transactions, and courts consider the overall intent and impact of the transactions. *See, e.g., Liquidation Trust v. Preferred Bank (In re Syntax–Brillian Corp.)*, 2011 WL 3101809, at *11 (Bankr. D. Del. July 25, 2011) ("Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors.") (citations omitted). In other words, courts focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 91 (D. Del. 2002). Factors that courts have considered in deciding whether or not to collapse multiple transactions include (1) whether all parties involved in the individual transactions had knowledge of the other transactions, (2) whether each transaction would have occurred on its own, and (3) whether each transaction was dependent or conditioned on the other transactions. *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 497 (Bankr. D. Del. 2010); *In re Jevic Holding Corp.*, 2011 WL 4345204, at *5 (Bankr. D. Del. Sept. 15, 2011); *In re Syntax–Brillian Corp.*, 2011 WL 3101809 (Bankr. D. Del. July 25, 2011).

*Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747, 770-71 (W.D. La. 2013); *see Wesco Aircraft Holdings, Inc. v. SSD Investments, Ltd. (In re Wesco Aircraft Holdings, Inc.)*, Adv. 23-3091, 2024 WL 156211, *19-20 (Bankr. S.D. Tex. Jan. 14, 2024) (discussing and denying summary judgment due to fact issues under collapsing doctrine, a/k/a integrated transaction doctrine or step-transaction doctrine).

35.     Applying this doctrine, the Court should collapse (a) the alleged sale of the Bonds from GIH and Genesis to Alliance with (b) the alleged sale of the Bonds from Alliance to the Debtor.   These were not legitimately distinct transactions.   Both agreements were executed simultaneously, and Alliance never paid for the Bonds.   By their very nature, these transactions could not have occurred on their own; they were dependent or conditioned on one another, and everyone involved knew what was going on.   The Defendants all but admit this by (a) acknowledging in their MTD that "a major holder of these bonds—James Goodman—was reluctant to directly sell these bonds back to the company on which he previously served as a director for fear of having the transactions attacked should the company default" and (b) boasting in their MTD that "[t]his created an opportunity that the Auerbach Defendants cannily (and legally) exploited simultaneously negotiating two separate deals."  MTD p. 4.

36.     After eliminating Alliance as a completely fictitious middleman or shill, however, the true nature of the transaction becomes clear.   On February 3, 2022, the Debtor wired $17,032,060.00 to Alliance, and Alliance immediately transferred $10,570,912.00 to GIH, $561,041.00 to Genesis, and $5,900,107.00 to Auerbach Partners.  No other money changed hands. Simultaneously, GIH and Genesis conveyed the Bonds to Alliance, and Alliance immediately conveyed the Bonds to the Debtor.   But once collapsed, it becomes clear that in reality the Debtor transferred $10,570,912.00 to GIH in exchange for the GIH Bonds, $561,041.00 to Genesis in exchange for the Genesis Bonds, and $5,900,107.00 to Auerbach Partners in exchange for

absolutely nothing.  The money and the bonds flowed right through Alliance in opposite directions to and from the real parties to the transaction.

**E.**     **THE DEBTOR DID NOT RECEIVE ANY VALUE IN EXCHANGE FOR THE $5.9 MILLION TRANSFER.**

37.     The Movants' argument that the Debtor received reasonably equivalent value depends entirely on its already debunked claim that the Court cannot look behind the form of the underlying transactions to their substance.  But once the Court collapses those transactions, the Movants' reasonably-equivalent-value argument falls apart.  The Trustee does not dispute that the Debtor received value for the $10,570,912.00 it transferred to GIH and the $561,041.00 it transferred to Genesis.  The Trustee has not sued to recover those amounts.  Auerbach Partners, however, provided nothing in exchange for the $5.9 Million Transfer, and that is the transfer the Trustee seeks to avoid.  None of the authority the Movants cite has any bearing on the situation at hand.

38.     What the Movants fail to acknowledge is the obvious: they were paid $5.9 million for acting as a shill to hide and conceal the transaction.  Perhaps Goodman or someone else received some value for that, but the Debtor did not.  The Debtor could and did purchase the Bonds for $11 million at a discount, but it received nothing by way of having the transaction hidden and concealed.  And, principles of *in pari delicto* and estoppel apply to the Movants' arguments here: one participating in a known wrong can hardly use his knowing participation in that wrong as a defense or an affirmative defense.

39.     On this issue, there is one more important principle to consider.  Texas law implies a resulting trust into the transaction here: "A resulting trust arises by operation of law when title is conveyed to one person but the purchase price or a portion thereof is paid by another.  The parties are presumed to have intended that the grantee hold title to the use of him who paid the purchase

price and whom equity deems to be the true owner." *Troxel v. Bishop*, 201 S.W.3d 290, 298 (Tex. App. – Dallas 2006). Unlike a constructive trust, a resulting trust is implied by law *ab initio* and does not need a court's adjudication to exist. *See San Antonio Loan & Trust Co. v. Hamilton*, 283 S.W.2d 19, 27 (Tex. 1955). Again, the Debtor's funds were used by Alliance to purchase the Bonds. At that very moment in time, Texas law provides that the Debtor, and not Alliance, owned the Bonds. For Alliance to then "sell" to the Debtor what the Debtor already "owned" for an added $5.9 million is both a constructively and an actually fraudulent transfer.

**F. THE TRUSTEE HAS ADEQUATELY PLED A CLAIM FOR CIVIL CONSPIRACY AND/OR KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY.**

40.     The Movants do not claim the Trustee has failed to plead claims for breach of fiduciary duty against Goodman and Frinzi. They merely take the position that the Trustee has not adequately pled that Auerbach and Auerbach Partners (the "Conspiracy Defendants") engaged in a conspiracy with Goodman and Frinzi to breach their fiduciary duties. Specifically, the Movants make three arguments: (a) the Trustee does not allege the Conspiracy Defendants had a meeting of the minds with Frinzi; (b) the Complaint ignores the structure of the transaction; and (c) there was no injury to the bankruptcy estate.

41.     The first argument falls apart with a simple quote from the Complaint: "In other words, rather than Auerbach buying the Bonds with his funds, or rather than the Debtor redeeming or paying the Bonds directly, Goodman, Frinzi, and Auerbach agreed to hide the true nature of the persons involved and the payments and transactions involved." Compl. ¶ 46. The Trustee also alleged that Auerbach, Goodman, and Frinzi had a long-standing friendship, Compl. ¶ 33; that Goodman and Frinzi brought Auerbach up to speed on the Debtors' financial woes, Compl. ¶ 35; and that Auerbach knew his role was to facilitate something nefarious, Compl. ¶ 47. Even if ¶ 46

did not expressly say it, the Court can certainly *infer* from these additional allegations that the Conspiracy Defendants and Frinzi had a meeting of the minds.

42.     The second argument makes no sense.  Structuring the transaction the way they did was the key to the conspiracy.  The Movants argue that "[n]either of the Conspiracy Defendants were ever Debtor's fiduciary …."  MTD p. 17.  But the Trustee never claimed they were.  They argue "their decision to purchase the Bonds from Goodman did not implicate Goodman's fiduciary duties to Debtor since *Goodman owned the Bonds*."  MTD p. 17 (emphasis original).  But they cite no authority for this puzzling proposition.  The Complaint alleges Goodman owed fiduciary duties to the Debtor, Compl. ¶¶ 21, 23, and the duty of loyalty prohibits self-dealing.  The Movants argue "Frinzi—*not Goodman*—'personally authorized and instructed' Debtor's purchase of the Bonds …."  MTD p. 17 (quoting Compl. ¶ 128).  But the Complaint also alleges Goodman was … the person who controlled Frinzi … and whose instructions Frinzi followed …."  Compl. ¶ 24.  It would not be necessary or even expected for two people to direct a particular corporate action, but that does not mean two or more people cannot conspire for one of them to act.

43.     This argument feels like a sovereign citizen invoking the alleged difference between "driving" and "traveling."  *See Van Horne v. Valencia*, 1:21-CV-00173-BU, 2022 WL 3574299, *4 n.2 (N.D. Tex. Feb. 16, 2022) ("Van Horne then appears to base his arguments [that he was not driving his vehicle] on the assertion that he was traveling, not driving.  Such a distinction is frivolous and without merit.").  In other words, the Movants seem to believe their scheme to obfuscate and legitimize an illegitimate transaction by involving a shill actually worked.  But again they elevate form over substance.  They also completely ignore the fact that Alliance never paid GIH or Genesis for the Bonds.  Even if the Court were bound to honor the form the conspirators gave the transaction, it would mean the Debtor transferred more than $17 million to Alliance in exchange for property Alliance did not own.

44.     The third argument does not really add up either.  The Movants claim the Trustee "cannot recover because [he] cannot establish any injury to the Bankruptcy Estate."  MTD p. 17. They argue "[t]he Debtor benefitted from the [transaction], leaving more funds available for distribution to unsecured creditors than would have been available if the transaction had never occurred."  *Id.*  But, again, it is not clear why they believe this, and again they seem to believe their scheme succeeded.  In reality, more than $17 million dollars went out the door, and the Debtor received absolutely nothing in exchange for the $5.9 million that went to Auerbach Partners.  In any event, the fact that the Debtor had *less debt* (the relative quantity of which is unknown) does not mean the Debtor had *more funds*.  It objectively had $17 million *fewer* dollars than before. The Complaint does not address the quantity of non-insider bonds that remained outstanding after this transaction, but the Court can reasonably infer that a hidden insider payment reduced the amount available to distribute to non-insider bondholders given the Debtor's imploding financial situation at the time.

45.     The analysis does not end with the elements of a traditional conspiracy.  Even though the Trustee has referred to this claim as one for "conspiracy," he has also alleged a claim for knowing participation in a breach of fiduciary duty.  Judge Lindsay recently considered a motion to dismiss and held the following:

> [T]he allegations in the Second Amended Complaint are sufficient to put Powers on notice that Plaintiff is asserting a claim for knowingly participating in Mr. Pethick's alleged breaches of fiduciary duty. This is so even though Count 4 is titled "Aiding and Abetting Breach of Fiduciary Duties." As Plaintiff's pleadings satisfy the elements for a claim of knowing participation in a breach of fiduciary duty, dismissal of Count 4 is not appropriate at this juncture.

*DeWolff, Boberg & Assoc., Inc. v. Pethick*, 3:20-CV-3649-L, 2022 WL 4589161, *8 (N.D. Tex. Sept. 29, 2022) (record citation omitted); *see Smith v. Morris R Greenhaw Oil and Gas, Inc. (In re Greenhaw Energy, Inc.)*, 359 B.R. 636, 641 (Bankr. S.D. Tex. 2007) ("the Fifth Circuit has held

that court may took to the substance of pleadings rather than the labels stated in the pleadings in determining what relief the [plaintiff] seeks").

46.     Likewise, it does not matter that the Trustee labeled this claim as one for "conspiracy" because he has more than adequately pled a claim for knowing participation. "Under Texas law, 'where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.'" *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942)). "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Id.* (citing *Cox Tex. Newspapers, L.P. v. Wootten,* 59 S.W.3d 717, 721–22 (Tex. App. 2001)). In addition to pleading a conspiracy in detail, the Trustee also pled each of these elements. Either way, the Court should deny the MTD. Even if the Court were to conclude the Trustee has not alleged and cannot allege a conspiracy claim, the Court can interpret this as a claim for knowing participation.

**G.    THE TRUSTEE HAS ADEQUATELY PLED A CLAIM FOR UNJUST ENRICHMENT.**

47.     The Movants quote *King v. Baylor Univ.*, 46 F.4th 344, 367 (5th Cir. 2022), for the propositions that "the unjust enrichment theory 'does not operate to rescue a party from the consequences of a bad bargain'" and "'the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract.'" MTD p. 18. But they omit another critical quote from that case: "'[g]enerally speaking, when a **valid**, express contract covers the subject matter of the parties' dispute, there can be no recovery under [such] a quasi-contract theory[.]'" *Id.* (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (emphasis added). Here there was no valid contract because Alliance could not contract to

sell Bonds it had not paid for and did not own.  Furthermore, there was no contract between the

Debtor and Auerbach Partners, the recipient of the $5.9 Million Transfer.  The Trustee has stated

a plausible claim for unjust enrichment.

**H.** **THE TRUSTEE HAS A VIABLE CLAIM FOR PARTNERSHIP LIABILITY**

48.     The Movants ask the Court to dismiss the partnership liability claim against the

Trusts because they claim the Trustee has not stated a claim against the partnership, Auerbach

Partners.  For reasons already discussed, the Trustee has stated multiple claims against Auerbach

Partners, so the Court should deny the MTD with respect to partnership liability.  The Movants do

not content general partners are not liable for partnership debts nor give any other reason for

dismissal.

49.     On this issue, the Movants argue that the Trustee has pled no claim against the

Trusts or against Mrs. Auerbach.  But he has: the trusts are the general partners of Auerbach

Partners.  He has sued Mrs. Auerbach as the trustee of the trusts, but he states in his complaint:

> As the Trustee does not know what type of trust this trust is, or what jurisdiction it
> is organized under, he does not know whether he is required to sue the trustee in
> order to sue the trust, or whether he may sue the trust directly. The trustee is
> prepared to dismiss J. Auerbach from this Complaint, without prejudice, provided
> that Auerbach Trust 1 and Auerbach Trust 2 agree that the Trustee does not need to
> sue her in order to sue and to obtain a judgment against these trusts.

Complaint at p. 5, n. 1.

50.     If the Trustee needs not sue the trustee of the trusts to obtain a judgment against the

trusts, then the trust defendants need only so state and agree, and the Trustee will dismiss Mrs.

Auerbach without prejudice.

### IV.     ALTERNATIVE MOTION
### FOR LEAVE TO AMEND

51.     Alternatively, to the extent the Court determines the Trustee failed to plead any

element of a cause of action with sufficient particularity, the Trustee requests leave to amend.  Rule

15 provides: "[t]he court should freely grant leave when justice so requires." Fed. R. Civ. P. 15(a)(2). There is a bias in favor of granting leave to amend, and the Court should not deny leave to amend with a substantial reason. *E.g. Laruche Imports, Inc. v. APL Ltd.*, No. 11-3127, 2012 U.S. Dist. LEXIS 15731, *2 (S.D. Tex. Feb. 8, 2012). "Normally, courts will afford a plaintiff the opportunity to overcome pleading deficiencies, unless it appears that the defects are incurable." *Bryan v. City of Dallas*, 188 F. Supp. 3d 611, N.D. Tex. 2016) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (stating that "a court ordinarily should not dismiss the complaint except after affording every opportunity for the plaintiff to state a claim upon which relief can be granted" (internal alterations omitted))).

52.     Accordingly, the Court should permit the Trustee to amend the Complaint to the extent necessary to meet applicable pleading standards.

## V.     <u>CONCLUSION</u>

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully request that the Court enter an order (A) denying the MTD; (B) granting leave to amend the Complaint to the extent the Court would otherwise be inclined to grant the MTD; and (C) providing the Trustee such other and further relief to which he is entitled at law or in equity.

RESPECTFULLY SUBMITTED this 19th day of March, 2024.

**MUNSCH HARDT KOPF & HARR P.C.**

By:  /s/ Davor Rukavina
_____

Davor Rukavina, Esq.
Tex. Bar No. 24030781
Thomas D. Berghman, Esq.
Tex. Bar No. 24082683
Julian P. Vasek, Esq.
Tex. Bar No. 24070790
500 N. Akard St., Ste. 4000
Dallas, Texas 75201
214-855-7500
drukavina@munsch.com
tberghman@munsch.com
jvasek@munsch.com

**COUNSEL FOR SCOTT M. SEIDEL,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on March 19, 2024, a true and correct copy of this document (along with any attachments) was served via the Court's CM/ECF system on all parties entitled to such notice, including counsel for the Movants (jgolinkin@jlcfirm.com).

By:  /s/ Davor Rukavina
_____

Davor Rukavina, Esq.