*Execution Version*

# BOND PURCHASE AGREEMENT

This Bond Purchase Agreement (this "Agreement") dated as of February 3, 2022, is made between Goodman Investment Holdings ("GIH"), Genesis Networks Inc. ("Genesis") (each individually a "Seller" and collectively, the "Sellers") and Alliance Texas Holdings, LLC a Florida limited liability company ("Purchaser").

WHEREAS, Purchaser intends to purchase from GIH $30,146,617 in face amount of the 8.000% Senior Secured Notes due 2022 (the "GNI Bonds") of Goodman Networks Incorporated., a Texas corporation ("GNI"), for a purchase price of $10,570,912.00 ("Purchased GIH Bonds") and from Genesis $1,600,000 in face amount of the GNI Bonds for a purchase price of $561,041.00 ("Purchased Genesis Bonds," and collectively with the Purchased GIH Bonds, the "Purchased GNI Bonds");

WHEREAS, Sellers desire to sell, grant, convey and transfer to Purchaser, and Purchaser desires to purchase, acquire and receive, the Purchased GNI Bonds owned by Sellers, upon the terms and subject to the conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Purchaser agree as follows:

1. Purchase and Sale:

   a. Purchaser shall acquire the Purchased GIH Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"), Purchaser shall purchase the Purchased GIH Bonds at a purchase price of $10,570,912.00 (the "GIH Purchase Price") by wiring same-day funds to GIH's account as set forth in that certain funds flow memorandum executed by the Purchaser and Sellers on the date of this Agreement (the "Funds Flow Memorandum"). Purchaser shall pay the GIH Purchase Price to GIH upon execution of this Agreement, and thereafter GIH shall instruct its prime broker to transfer within 5 days the Purchased GIH Bonds to Purchaser's brokerage account as set forth in the Funds Flow Memorandum.

   b. Purchaser shall acquire the Purchased Genesis Bonds in a transaction that complies with all applicable laws, including the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities Exchange Commission promulgated thereunder (the "Securities Act"), Purchaser shall purchase the Purchased Genesis Bonds owned by Genesis at a purchase price of $561,041.00 (the "Genesis Purchase Price," and collectively with the GIH Purchase Price, the "Aggregate Purchase Price") by wiring same-day funds to Genesis's account as set forth in the Funds Flow Memorandum. Purchaser shall pay the Genesis Purchase Price to Genesis upon execution of this Agreement, and thereafter Genesis shall

71672585_2



    instruct its prime broker to transfer within 5 days the Purchased Genesis Bonds to Purchaser's brokerage account as set forth in the Funds Flow Memorandum.

   c. Purchaser's obligation to pay the Aggregate Purchase Price and Sellers' obligations to deliver the Purchased GNI Bonds in accordance herewith is not subject to any condition other than as provided specifically in this Agreement. Purchaser and Sellers further acknowledge and agree that the obligations of the Sellers under this Agreement may be settled only with the Purchased GNI Bonds.

2. <u>Indemnification:</u>

   a. Sellers agree to indemnify Purchaser and its directors, officers and any person who controls the Purchaser (within the meaning of the Securities Act) (each, a "<u>Purchaser Indemnitee</u>") from and against all losses, claim, damages and liabilities, including reasonable attorneys' fees and expenses ("<u>Losses</u>"), in respect thereof, to which any Purchaser Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Sellers' agreements, covenants or representations or warranties under this Agreement. The Sellers shall reimburse such Purchaser Indemnitee for any legal or other expenses reasonably incurred by such Purchaser Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

   b. Purchaser agrees to indemnify Sellers, their affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a "<u>Seller Indemnitee</u>") from and against any Losses to which any Seller Indemnitee may become subject, whether commenced or threatened, insofar as such Losses arises out of, or are based upon, any breach of Purchaser's agreements, covenants or representations or warranties under this Agreement. Purchaser shall reimburse such Seller Indemnitee for any legal or other expenses reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses.

3. <u>No Legal Obligation; Confidentiality</u>. Each party hereto agrees that neither the Sellers, nor Purchaser (including any of their respective affiliates) or any of their or their respective affiliates' current, former or future officers, directors, members, partners, employees or stockholders are, or will be, under any legal obligation of any kind whatsoever by virtue of this Agreement or any written or oral expression, except for the matters specifically agreed to herein. Notwithstanding the foregoing, neither party shall disclose the existence of this Agreement, the purchase of the Purchased GNI Bonds hereunder, and any other discussions related to or arising out of the transactions contemplated by this Agreement. Each party agrees that it shall keep all of the foregoing information confidential until the earlier of (A) the public disclosure of a definitive restructuring transaction with respect to GNI and the Purchased GNI Bonds and (B) the termination of this Agreement.

4. <u>Termination</u> This Agreement shall terminate upon the earlier of (A) the mutual written agreement of the parties and (B) the public disclosure of a definitive restructuring transaction with respect to GNI and/or the Purchased GNI Bonds.

5. <u>Miscellaneous</u>:

    a. Sellers and Purchaser each acknowledge and agree that:

    (i) it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such tax, accounting, regulatory, legal and financial advisers as it has deemed necessary, and not upon any view expressed by the other. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Agreement.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of entering into this Agreement;

    (ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Agreement. It is also capable of assuming, and assumes, the risks of this Agreement;

    (iii) Sellers further acknowledges that Purchaser is entering into this Agreement with such Sellers in reliance on this acknowledgment and with such Sellers' understanding, acknowledgment and agreement that Purchaser is privy to material non-public information regarding GNI and its affiliates and subsidiaries (collectively, the "Non-Public Information"), which Non-Public Information may be material to a reasonable investor, such as the undersigned Sellers, when making investment disposition decisions, including the decision to enter into this Agreement, and such Sellers' decision to enter into the Agreement is being made with full recognition and acknowledgment that Purchaser is privy to the Non-Public Information, irrespective of whether such Non-Public Information has been provided to such Sellers. The undersigned Sellers hereby waive any claim, or potential claim, it has or may have against Purchaser relating to Purchaser's possession of Non-Public Information;

    (iv) the other party is not acting as a broker, agent or fiduciary for, or an adviser to it in respect of the transactions contemplated by this Agreement and each party is acting for its own account and it has made its own independent decision to enter into this Agreement;

    (v) Neither party is receiving any compensation or fees in respect of the specific transactions contemplated in this Agreement; and

    (vi) All Purchased GNI Bonds subject to this Agreement shall be acquired in compliance with applicable law, including the Securities Act.

    b. Purchaser represents to Sellers:

(i) it (A) does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), (B) is not a party with which the Company is prohibited to deal under the laws of the United States, and (C) is not a Person identified as a terrorist organization on any other relevant lists maintained by governmental authorities;

(ii) the monies used to enter into this agreement have not been and will not be derived from or related to any illegal activities, including, without limitation, money laundering activities;

(iii) in the event that it receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "Non-U.S. Bank") in connection its interests hereunder, such Non-U.S. Bank: (A) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (B) employs one or more individuals on a full-time basis; (C) maintains operating records related to its banking activities; (D) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (E) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate;

(iv) it will provide to Sellers at any time such information as Sellers determine to be necessary or appropriate (A) to comply with the anti-money laundering laws, rules and regulations of any applicable jurisdiction and (B) to respond to requests for information concerning its identity from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information;

(v) Purchaser further acknowledges that Seller is entering into this Agreement with such Purchaser in reliance on Purchaser's acknowledgments contained herein and with such Purchaser's understanding, acknowledgment and agreement that Seller may be privy to the Non-Public Information, which Non-Public Information may be material to a reasonable investor, such as the undersigned Purchaser, when making investment disposition decisions, including the decision to enter into this Agreement, and such Purchaser's decision to enter into the Agreement is being made with full recognition and acknowledgment that Seller may be privy to the Non-Public Information, irrespective of whether such Non-Public Information has been provided to such Purchaser. The undersigned Purchaser hereby waives any claim, or potential claim, it has or may have against Seller relating to Seller's possession of Non-Public Information;

(vi) Purchaser is an "accredited investor" as defined in Rule 501(a) under the Securities Act;

(vii) Purchaser acknowledges that neither Seller nor any other person offered to sell the Purchased GNI Bonds to it by means of any form of general solicitation or advertising, including but not limited to: (A) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or

4

broadcast over television or radio or (B) any seminar or meeting whose attendees were invited by any general solicitation or general advertising;

(viii) Purchaser is acquiring the Purchased GNI Bonds solely for Purchaser's own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any Distribution of the Purchased GNI Bonds. Purchaser understands that the Purchased GNI Bonds have not been registered under the Securities Act or any state securities laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of Purchaser and of the other representations made by Purchaser in this Agreement; For purposes of this representation "Distribution" has the meaning given to it under the Rules and Regulations promulgated under the Securities Act.

(ix) Purchaser understands that the Purchased GNI Bonds are "restricted securities" under applicable federal securities laws and that the Securities Act and the rules of the U.S. Securities and Exchange Commission (the "Commission") provide in substance that Purchaser may dispose of the Purchased GNI Bonds only pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements of the Securities Act, and Purchaser understands that GNI has no obligation or intention to register any of the GNI Bonds or the offering or sale thereof, or to take action so as to permit offers or sales pursuant to the Securities Act or an exemption from registration thereunder (including pursuant to Rule 144 thereunder). Accordingly, Purchaser understands that under the Commission's rules, Purchaser may dispose of the Purchased GNI Bonds only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities," subject to the same limitations that apply to the Purchased GNI Bonds in the hands of Purchaser. Consequently, Purchaser understands that Purchaser must bear the economic risks of the investment in the Purchased GNI Bonds for an indefinite period of time;

(x) Purchaser agrees: (A) that Purchaser will not sell, assign, pledge, give, transfer, or otherwise dispose of the Purchased GNI Bonds or any interest therein, or make any offer or attempt to do any of the foregoing, unless the transaction is registered under the Securities Act and complies with the requirements of all applicable state securities laws, or the transaction is exempt from the registration provisions of the Securities Act and all applicable requirements of state securities laws;

(xi) Purchaser is aware of, and Seller has fully disclosed to Purchaser, the current financial and operational condition of GNI, including, without limitation, that GNI has no material assets, employees or operations, that GNI's liabilities exceed GNI's assets, that GNI may be considered insolvent and that GNI is very likely to default on future payments with respect to the GNI Bonds, including payments with respect to the GNI Bonds, including the Purchased GNI Bonds, when such GNI Bonds mature; and

5

    (xii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it makes a payment to Sellers. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Sellers in writing.

c. Sellers hereby represent to Purchaser:

    (i) that it has or will acquire GNI Bonds only in transactions that comply with all applicable securities laws, including the Securities Act; and

    (ii) the representations and warranties set forth herein shall be deemed repeated and reaffirmed by it as of each date that it transfers Purchased GNI Bonds to Purchaser. If at any time during the term of this agreement the representations and warranties herein cease to be true, it shall promptly so notify Purchaser in writing.

d. Each of the parties hereby represents and warrants that the execution, delivery and performance of this Agreement are within the party's applicable limited partnership, limited liability company or corporate power, as the case may be, and have been duly authorized by all necessary applicable limited partnership, limited liability company or corporate action, as the case may be,, and this Agreement constitutes the legal, valid and binding obligation of the party in accordance with its terms.

e. This Agreement contains the sole and entire agreement between the parties with respect to the matters set for herein.

f. All modifications and amendments to this Agreement or any part hereof must be in writing signed by or on behalf of the parties and any waiver of any breach or provision of this Agreement must be signed by the party waiving such breach or provision. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by applicable law. Upon such determination of invalidity or unenforceability, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible. It is understood and agreed that no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder. No waiver of any breach or provision of this Agreement shall be deemed to be a waiver of any other or subsequent breach or provision, whether of like or different nature.

g. Neither party may assign this Agreement or any of its rights or obligations hereunder unless such other party hereto approves such assignment in advance and in writing. Subject to the foregoing, each and all of the terms, conditions and provisions herein contained shall be binding upon, and inure only to the benefit of, the parties and their respective successors, heirs and permitted assigns.

h. The parties hereby agree that any rule of interpretation that would require interpretation of ambiguities in this Agreement against any party that drafted it is not

applicable and is expressly waived. Whenever used herein, (A) the words "include," "includes" and "including" shall mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and (B) masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others whenever the context so indicates.

i. This Agreement may be executed in any number of counterparts (including in electronic format such as .pdf) and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

j. All notices under this Agreement shall be in writing and shall be deemed given (A) when delivered personally by hand (with written confirmation of receipt), (B) one business day following the day sent by overnight courier (with written confirmation of receipt), (C) when sent via email (with confirmation of delivery), or (D) three (3) days after deposit with United States Mail if sent by registered or certified mail, return receipt requested, in each case to the following addresses set forth for the applicable party (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:    Alliance Texas Holdings, LLC
c/o Hudson Sustainable Group
333 S.E. 2nd Avenue, Suite 3410
Miami, FL 33131
Attn: Neil Auerbach
Neil.Auerbach@hudsonsustainable.com

With a copy to:
Baker Botts L.L.P
910 Louisiana Street
Houston, Texas 77002
Attention: Douglas V. Getten
Doug.getten@bakerbotts.com

If to GIH:    Goodman Investment Holdings
24 Waterway Avenue, Suite 500
The Woodlands, Texas 77380
Attn: Jason Cramer

If to Genesis:    Genesis Networks Inc.
24 Waterway Avenue, Suite 500
The Woodlands, Texas 77380
Attn: Jason Cramer

7

    k.  This Agreement shall be construed in accordance with and be governed by the laws of the State of Texas (without reference to choice of law doctrine). Any action brought in connection with this Agreement shall be brought in the federal or state courts located in Harris County, and the parties hereby irrevocably consent to the jurisdiction of such courts and waive any objections as to venue or inconvenient forum. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR ANY INTERPRETATION THEREOF, AND FOR ANY COUNTERCLAIM RELATED THERETO.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers or authorized representatives as of the day and year first above written.

**ALLIANCE TEXAS HOLDINGS, LLC**

By: _____
Name: Neil Auerbach

*Signature Page to Bond Purchase Agreement*

**GOODMAN INVESTMENT HOLDINGS**

By: _____
Name:
Title:

*Signature Page to Bond Purchase Agreement*

**GENESIS NETWORKS INC.**

By: _____
Name:
Title:

*Signature Page to Bond Purchase Agreement*