Randall A. Pulman
State Bar No. 16393250
Kerry S. Alleyne-Simmons
State Bar No. 24066090
Matthieu Belanger-Coast
State Bar No. 24128756
**PULMAN, LEFLORE, PULLEN & REED, LLP**
2161 NW Military Hwy., Suite 400
San Antonio, Texas 78213
Telephone: (210) 222-9494
Facsimile: (210) 892-1610
rpulman@pulmanlaw.com
kalleyne@pulmanlaw.com

**COUNSEL FOR THE GOODMAN DEFENDANTS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: § § | | CASE NO. 22-31641-MVL-7 |
| GOODMAN NETWORKS, INC., § DEBTOR. § | | CHAPTER 7 |
| SCOTT M. SEIDEL, TRUSTEE, § PLAINTIFF § § V. § § HUDSON CLEAN ENERGY ENTERPRISES, LLC; § ALLIANCE TEXAS HOLDINGS, LLC; NEIL Z. § AUERBACH; JUDITH AUERBACH; AUERBACH § PARTNERS, L.P.; JAMES GOODMAN; JAMES § FRINZI; GOODMAN INVESTMENT HOLDINGS, § LLC; GENESIS NETWORKS, INC.; GENESIS § NETWORKS GLOBAL SERVICES, LLC; § AUERBACH CHILDREN'S DYNASTY TRUST U/A/D § OCTOBER 9, 2012; AND AUERBACH FAMILY § DYNASTY TRUST U/A/D OCTOBER 9, 2012 § DEFENDANTS § | | ADVERSARY NO. 23-03090-MVL |

**CROSS-CLAIMANT GOODMAN INVESTMENT HOLDINGS, LLC'S RESPONSE
TO CROSS-DEFENDANTS ALLIANCE TEXAS HOLDINGS, LLC'S MOTION TO
DISMISS
[RELATING TO ADV. DKT. NO. 141]**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

Cross-Claimant Goodman Investment Holdings, LLC ("**GIH**") files this *Response to Cross-Defendants Alliance Texas Holdings, LLC's Motion to Dismiss* [Adv. Dkt. 141] (the "**Motion to Dismiss**"), respectfully showing the Court the following:

## I.    BACKGROUND

1.      As of February 2022, GIH held and owned $30,146,617 in face amount of 8.000% Senior Secured Notes due 2022 of Goodman Networks, Inc. ("**GNI Bonds**"). James E. Goodman, on behalf of GIH, entered into an agreement to sell the GNI Bonds to Alliance Texas Holdings, LLC ("**Alliance**"). That transaction and the underlying Bond Purchase Agreement ("**Bond Agreement**") form the basis for GIH's Second Amended Crossclaim.

2.      At the same time that GIH entered into the Bond Agreement with Alliance, both parties signed a Funds Flow Memorandum ("**Funds Flow Memorandum One**") detailing the flow of funds between GIH and Alliance.

3.      Simultaneously, Alliance circulated an unsigned Second Funds Flow Memorandum ("**Funds Flow Memorandum Two**") among Max Klein, John Mcmullan, and Shalom Auerbach evidencing an intent to immediately redeem the GIH GNI Bonds. On information and belief, the money that Alliance used to pay GIH for the GNI Bonds was derived from GNI itself, as evidenced by these communications.

4.      GIH filed its original crossclaim against Alliance and Neil Auerbach on December 20, 2024, relying on representations that Alliance made to GIH in the Bond Agreement. GIH then amended that crossclaim on February 20, 2025. On March 4, 2025, GIH voluntarily agreed to dismissal of the previous crossclaim without prejudice. GIH's Second Amended Crossclaim was timely filed on March 17, 2025, and Alliance filed its Motion to Dismiss on March 31, 2025.

2

## II.    ARGUMENTS AND AUTHORITIES

5.    As both parties have agreed, Texas law requires four elements to establish a breach of contract: the existence of a valid contract; performance by the plaintiff; breach of contract by the defendant; and damages sustained by the plaintiff as a result of the breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009). Notably, Alliance has not denied the existence of a valid contract nor has it denied that GIH performed under the contract.

**A. GIH has alleged a breach of the Bond Agreement.**

6.    GIH provided three clauses that Alliance breached. The first was the representation that Alliance purchased the bonds for investment purposes. The second was a representation that Alliance was acting for its own account. The third was a representation that Alliance was not receiving any compensation or fees for the transaction.

7.    Alliance maintains that it has not breached the first representation because redeeming the bonds is an investment purpose. This is a disingenuous argument at best. Certainly, had Alliance purchased the bonds and then held them for several months before redeeming them, Alliance may have an argument that the bonds were purchased for investment purposes. However, as GIH laid out in its crossclaim, Alliance was internally discussing redeeming the bonds before the purchase was even completed. The timeframe between Alliance acquiring the bonds and successfully redeeming them is mere days. Indeed, the Trustee has alleged that Alliance used GNI's money to purchase the bonds in the first place.[1]

8.    Alliance focuses on the remainder of the representation, which specifies that Alliance is not attending to resell or Distribute the GNI Bonds. However, the representation does

---

[1] Complaint at Paragraph 49, "Equally, S. Auerbach encouraged Frinzi to use, and required Frinzi to use, the Debtor's own funds to fund the transaction." GIH continues to maintain that, if Alliance used GNI money to purchase the GNI Bonds, this was done without GIH's or James E. Goodman's knowledge or approval.

not say, "for investment purposes, and the only non-investment purposes are resale and Distribution." The representation states that the GNI Bonds are being purchased "solely for [Alliance]'s own benefical account, for investment purposes, and not with a view to, or for resale in connection with, any Distribution…." Each of these comprises part of a list. The GNI Bonds are being acquired "solely for [Alliance]'s own benefical account [*and*] for investment purposes[] *and* not with a view to, or for resale in connection with, any Distribution…." [emphasis added]. The list being connected by "and" suggests that each of these things are independently true.

9. Perhaps anticipating this issue, Alliance also argues that redemption is a valid investment purpose because bonds are regularly redeemed by investors. Again, this might be true under ordinary circumstances, but investors do not ordinarily redeem bonds within days of acquiring said bonds. They certainly do not ordinarily see a 50% return on investment when redeeming bonds in an insolvent corporation. Given the timing and Alliance's behavior, whether Alliance was truly acquiring the GNI Bonds for a proper investment purpose appears to be a disputed fact. It would be premature to dismiss the crossclaim on the assumption that redeeming the GNI Bonds was an investment action, taking the facts as a whole.

10. Second, Alliance contends that it was acting for its own account. However, when Alliance redeemed the GNI Bonds, Funds Flow Memorandum Two shows that Hudson was instructed to transfer $10.5 million to GIH, $561,041 to GNGS, and $5.9 million to "Auerbach Partners, LP."[2] Assuming without conceding that the $5.9 million was legitimate profits from the GNI Bonds, why would Alliance transfer all of those profits to Auerbach Partners if it was acting for its own account? It appears that the GNI Bonds were purchased for Aurbach Partners's account, not Alliance's.

---

[2] Complaint at Paragraph 65.

11. Third, Alliance contends that that it did not breach the representation that it was not receiving any compensation or fees for the transaction. Alliance essentially argues that it was not prohibited from redeeming the GNI Bonds, and nothing was stopping Alliance from making a profit when redeeming the GNI Bonds. First, GIH maintains that Alliance *was* prohibited from redeeming the GNI Bonds, at least in the manner it did, because it breached a separate representation that it was acquiring the GNI Bonds for investment purposes. Second, even if Alliance was not prohibited from redeeming the GNI Bonds, surely, Alliance did not believe that the value of the bonds would appreciate $5.9 million a mere day after the sale. That is nearly a fifty percent return on investment on bonds in an insolvent company.

12. Furthermore, if the Trustee is correct and Alliance used GNI's money to fund the original Bond Agreement,[3] then redemption of the GNI Bonds is directly tied to the sale of the GNI Bonds in the Bond Agreement. From Alliance's point of view, this was all one transaction. A transaction where James Frinzi, who is and was a good friend of Alliance Director Shalom Auerbach, assisted Alliance in obtaining $5.9 million in compensation from an insolvent company.

**B. GIH's damages are not speculative.**

13. Alliance claims that GIH's only damages on this cross-claim are speculative because GIH has not yet been found liable to the Trustee and GIH complains only of being subject to litigation. The damages are not speculative. The Trustee seeks to avoid the entire purchase price on the basis that the money for the purchase originated with GNI.[4] That is $10.5 million in liability. Alliance also contends that the damages are contingent on the Trustee winning its lawsuit against GIH and/or Alliance. Alliance would have GIH wait until the verdict is handed down

---

[3] Again, GIH maintains that, if this happened, it happened without GIH's or James E. Goodman's knowledge or approval.

[4] See Complaint Counts 3 and 4. GIH maintains that it had no knowledge that the funds were transferred from GNI, and GIH would never have faced litigation over this had Alliance held the GNI Bonds for investment purposes.

before proceeding to sue Alliance separately, likely in a different court before a different judge in a suit that would likely take several years. This would be a waste of judicial time and resources. GIH's damages will be knowable within this lawsuit and can be determined by the fact-finder in this matter.

14. Furthermore, Alliance appears to have forgotten that the Bond Agreement explicitly accounted for the possibility of either party being subjected to litigation as a result of the breaches of the representations of the other party. The Bond Agreement provides: "Purchaser agrees to indemnify Sellers, their affiliates, officers, directors, agents, partners, members, managers, shareholders and employees (each, a 'Seller Indemnitee') from and against any Losses to which any Seller Indemnitee may become subject, **whether commenced or threatened**, insofar as such Losses arises [sic] out of, or are based upon, any breach of Purchaser's…representations…under this Agreement. Purchaser shall reimburse such Seller Indemnitee for **any legal or other expenses** reasonably incurred by such Seller Indemnitee in connection with the investigating or defending or preparing to defend against or appearing as a third-party witness in connection with any such Losses." (Bond Agreement at 2b) [emphases added].

15. Upon a finding that Alliance breached its representations in the Bond Agreement, GIH will be entitled to request legal expenses incurred in defending this adversary proceeding under the terms of the contract, and GIH intends to do so.

**CONCLUSION AND PRAYER**

WHEREFORE, PREMISES CONSIDERED, Cross-Claimant GIH prays that this Court denies Alliance's Motion to Dismiss and for such other and further relief as it may show itself to be justly entitled.

Dated: April 21, 2025    Respectfully Submitted,

By: _/s/Randall A. Pulman_
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Kerry S. Alleyne-Simmons
Texas State Bar No. 24066090
kalleyne@pulmanlaw.com
Matthieu Belanger-Coast
Texas State Bar No. 24128756
matthieu@pulmanlaw.com
**PULMAN, LEFLORE, PULLEN & REED LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 21, 2025, the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

/s/Randall A. Pulman
Randall A. Pulman

4914-5651-9225, v. 1